STATE of Missouri, Respondent,

v.

Roscoe FORD, Appellant.

No. 57682.

Supreme Court of Missouri, En Banc.

June 11, 1973.

John C. Danforth, Atty. Gen., Stephen
D. Hoyne, Asst. Atty. Gen., Jefferson City,
for respondent.

Philip H. Schwartz, the Legal Aid and Defender Society of Greater Kansas City, Kansas City, for appellant; Paul T. Miller, Executive Director, Willard B. Bunch, Chief Defender, Kansas City, of counsel.

BARDGETT, Judge.

Defendant-appellant Roscoe Ford was found guilty of first-degree murder, a felony, by a jury which assessed punishment at death. The court entered its sentence and judgment in accordance with the jury verdict and defendant appeals. Notice of appeal was filed in circuit court on January 12, 1972.

■ This court does not have original appellate jurisdiction of this case under Mo.Const., Art. V, § 3, as amended 1970, V.A.M.S.; Parks v. State, 492 S.W.2d 746 (Mo. banc 1973). The court retains and decides the case under the authority of Foremost-McKesson, Inc. v. Davis, 488 S.W.2d 193, 196 (Mo. banc 1972), and because the death penalty was imposed, State v. Clark, 494 S.W.2d 26 (Mo.1973, May 14, 1973, No. 58018).

· This is a companion case of State v. Owens, 486 S.W.2d 462 (Mo.1972).

The state's evidence supports the following statement of facts: At about midnight on October 30, 1969, Ronnell Wheeler, George Mayfield, Raymond Florio, Melvin Owens, and Roscoe Ford went to Johnny's Lunch in Kansas City, Missouri, in Ronnell Wheeler's car. As they drove over some railroad tracks someone in the car said that the cafe would be a good place to "hit" or rob. Ronnell Wheeler drove to about fifty yards on the other side of the cafe, Raymond Florio got out and went to see who was inside the cafe, and Ronnell Wheeler drove down the street and picked up Florio at the corner. Florio reported that there were two people inside, one behind the counter and one in the back. Ronnell Wheeler then drove down the alley and George Mayfield, Melvin Owens, and Roscoe Ford got out of the car. May-

field, Owens, and Ford left the car with two pistols and a sawed-off shotgun, walked down the alley and headed toward the cafe. Shortly thereafter Ronnell Wheeler looked down the alley, saw someone cross the alley and cross back again toward Johnny's Lunch and then heard several shots. Later the three came back to the car. Ford had been shot in the hand. The three jumped into the car and drove to George Mayfield's house. There George Mayfield gave some money to Raymond Florio and Melvin Owens. Ronnell Wheeler and Melvin Owens then went to pick up Roscoe Ford's girlfriend, Brenda McNight. The group then left, dropped Melvin Owens and Raymond Florio off at 27th and Brown, and went to a filling station, where Ronnell Wheeler purchased some gas with money George Mayfield had provided. While at the station, Brenda McNight went inside to wash blood off the money. The group then drove to Wichita, Kansas, to a hospital for treatment of Roscoe Ford's hand. The police came to the hospital and were told that Roscoe Ford had been shot during a robbery that night in Wichita. After Ford received medical attention the group returned to Kansas City and drove to George Mayfield's house. Ronnell Wheeler took Brenda McNight home to change clothes and then took her to work, and Wheeler went home to sleep.

Willard McGowan, a Kansas City, Missouri, policeman, was in the vicinity of Johnny's Lunch on October 30, 1969, and at twenty minutes after midnight was dispatched to Johnny's Lunch to investigate a possible robbery in progress. Officer McGowan entered by the front door and observed Emil Thomas, an employee of Johnny's Lunch, behind the counter and observed the body of Johnny Harsh lying with his head in the back room and his feet and legs extended into the counter area; Harsh was lying in a large pool of blood and appeared to be dead. Officer McGowan notified the Crime Against Persons Unit of the Kansas City Police Department and secured the crime scene un-

til detectives arrived. At that time the cash register was open, a few pennies were in the tray, blood was on several of the keys of the cash register and also in the tray. A fingerprint left in the blood in the cash register tray was examined and was identical to the left thumb impression of Roscoe Ford. A fingerprint found on a coffee cup on the lunch counter was examined and found to be identical to the right index finger of Roscoe Ford. Size number six pellets, .32 caliber bullets, .38 caliber bullets, .38 caliber Special bullets, and .410 shotgun wadding were found at the scene; a .38 caliber Smith and Wesson revolver and a .38 caliber Special revolver were found under the counter. David Zoller, a pathologist, performed an autopsy and concluded that Johnny Harsh's death was caused by a shotgun wound at the base of the brain.

On February 3, 1970, F.B.I. Agents Hugh Ford and Daniel Ryan arrested defendant in Middletown, New York. At first defendant denied being Roscoe Ford and claimed his name was Tyrone Carson. After defendant identified himself as Roscoe Ford, the agents advised him of his rights, read a "Rights and Waiver" form to him and presented him with the "Rights and Waiver" form to read. Defendant read it and signed it. The form was admitted into evidence and reads as follows: "Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer, one will be afforded for you before any questioning, if you wish. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have a right to stop answering at any time until you have talked to a lawyer. Waiver of Rights: I have read the statement of my rights and I understand what my rights are and

I am willing to make a statement and answer questions. I do not have a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

Defendant did not request a lawyer. He did not care to give a signed statement but did converse with Agents Ford and Ryan about the homicide in Kansas City. According to Agent Ford, the defendant stated that late in October of 1969 he was in Kansas City in the company of individuals he identified as George Mayfield, Mel, Ray, and Ronnell, and they robbed Al or Joe's Cafe in Kansas City. Agent Ford testified that defendant told him that "[e]ither the individual named 'Mel' [Owens] or 'Ronnell' [Wheeler] had planned this robbery and he did not know in what part of Kansas it was. He wasn't sure whether it was Kansas City, Kansas or Kansas City, Missouri. He stated that he received information from one of the individuals, I believe that it was an 'easy touch,' or an easy place to rob because it was operated by an old lady. He said they went to this cafe and he and Mayfield entered the cafe and sat down. They ordered coffee or food and they noticed that there was an older man in front and a younger man in the rear. As they were sitting there, he said at the time they entered the cafe, he was either armed with a .357 Magnum or .38 revolver, or Mr. Mayfield had the Magnum and he had the revolver, he was not sure. He said when they sat down at the counter, another individual, I believe it was Mel, entered the cafe and Mel was in possession of a sawed-off shotgun and when the shooting started in the cafe, he said he got up and was evidently in the line of fire and was struck in the hand and I believe the stomach and fell to the floor. He said that Mayfield helped him out of the cafe into a waiting car, which I believe Ronnell was in the car at the time.

"Mr. Ford said that he had lost quite a bit of blood, he was very hazy about this

point due to the fact he had lost so much blood. He said after he reached the car they proceeded to—I believe, Wichita, Kansas. They proceeded to Wichita, Kansas, where Mr. Ford went to a hospital and where he received treatment. He said the police came and that Mr. Mayfield handled most of the contact with the police and that he left the hospital that night when he was left unattended." Defendant did not say he did any shooting in the cafe. He did say that if any Magnum shots were fired in the cafe, they were fired by Mr. Mayfield; that when defendant was shot, his gun fell to the floor and was picked up by Mayfield, and the next time defendant saw it, it was in the car; and that a few days after returning from the hospital, Mayfield, defendant, and Mayfield's girlfriend left for the New York City area.

The case was submitted to the jury under the first-degree felony-murder statute, § 559.010, RSMo 1969, V.A.M.S., on the basis that the killing of John Harsh occurred during the course of a robbery participated in by defendant.

Defendant filed a motion to suppress the confession on the grounds (1) that he was illegally arrested and any confession was the product of the illegal arrest; (2) that the oral confession was elicited by coercion and threats and was, therefore, involuntary; and (3) that the confession was given while defendant was in custody after the F.B.I. had focused on him as a murder suspect but without adequate waiver of his Fifth Amendment rights. The trial court held an evidentiary hearing on defendant's motion to suppress and overruled the motion.

Defendant's first three points on this appeal assert the court erred in overruling his motion to suppress the confession. The evidence taken on the motion to suppress supports the following summary:

Through statements taken from other suspects, fingerprints, and a description received from the Topeka, Kansas, or Shawnee County, Kansas, police, the Kansas City, Missouri, police determined that Roscoe Ford was implicated in the death of John Harsh. On December 13, 1969, an indictment was returned charging " . . . one GEORGE MAYFIELD and one ROSCOE FORD a/k/a Roscoe Hayden a/k/a Tyrone Mayfield, whose more full and true names are unknown to the members of the Grand Jury . . ." with first-degree murder of John Harsh.

A warrant for the arrest of Roscoe Ford was issued by the U. S. District Court for the Western District of Missouri upon the filing of a complaint for violation of 18 U.S.C. § 1073 (1966), unlawful flight to avoid prosecution for a felony. The Kansas City police received information that Roscoe Ford and Mayfield were in Middletown, New York, with one Theresa Bugg. This information was given to F. B.I. Agent Hugh Ford in New York. Agents Ford and Ryan and other F.B.I. agents went to the Middletown police department to locate Ford and Mayfield and inquired about them. The Middletown police told the agents that the names Ford and Mayfield were not known to them, but on that day, February 3, 1970, two Middletown detectives had interviewed two individuals whose descriptions were similar to Ford and Mayfield. The detectives knew where these two subjects were located so they picked up the two men and brought them to the Middletown police station.

Agent Ford spoke with Roscoe Ford and told him there was an outstanding unlawful flight warrant for a Roscoe Ford. Roscoe denied he was Roscoe Ford and gave his name as Tyrone Carson, and when requested to produce some identification could not do so. Agent Ford asked him to submit to fingerprinting. Roscoe refused at first. Agent Ford told him that if he (Roscoe) could not produce a draft card he was in violation of the selective service laws and could be arrested and subsequently fingerprinted. Roscoe Ford then agreed to the fingerprinting. While one agent was checking the fingerprints

with the Washington, D. C., F.B.I. office, Roscoe identified himself as Roscoe Ford.

Roscoe Ford had been indicted in November 1969 for first-degree murder and pursuant thereto there was an outstanding warrant for his arrest. There was also an outstanding federal warrant for his arrest which was bottomed on the first-degree murder charge and issued pursuant to 18 U.S.C. § 1073 (1966), which designates interstate transportation to avoid felony prosecution as a felony under federal law. Both warrants were outstanding on February 3, 1970, when he was arrested in Middletown, New York. An F.B.I. agent is authorized to arrest without warrant for any felony cognizable under the laws of the United States if he has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony. 18 U.S.C. § 3052 (1969).

■ The existence of the federal warrant for the arrest of Roscoe Ford was the probable cause upon which Agent Ford acted. Defendant does not contend that there was not probable cause for the issuance of the federal warrant. It appears to be defendant's contention that Agent Ford had to personally know all the information that had been presented to the U. S. District Court for the Western District of Missouri in order for Agent Ford to have probable cause to arrest Roscoe Ford. Agent Ford knew the federal arrest warrant had issued and he was acting pursuant to orders from his superiors which orders were based on the existence of the federal warrant. The existence of the federal arrest warrant was in itself sufficient probable cause for Agent Ford to arrest Roscoe Ford. In State v. Owens, *supra*, this court held that the arrest of Owens by Detective Brown was a valid arrest because Detective Brown's superior, Chief Daniels, had probable cause to arrest Owens and ordered Brown to do so. It was not necessary that Brown have all the information that Chief Daniels had, and it was not necessary here that Agent Ford be pos-

sessed of all the information that had been presented to the judicial officer at the time the federal arrest warrant was issued.

■ As part of this point defendant is contending that the description Agent Ford had of the Roscoe Ford who was the subject of the arrest warrant was not a sufficient description to authorize the Middletown police to take him into custody nor for Agent Ford to detain and fingerprint him. Agent Ford received a teletype message from the Kansas City office which gave a physical description of Roscoe Ford, albeit incorrectly describing his teeth, and which stated that Roscoe Ford was believed to be traveling with George Mayfield and Theresa Bugg, and that Theresa Bugg had wired her aunt and said she had been severely beaten and gave a Middletown, New York, address. The investigation had already focused on Roscoe Ford and the court holds that Agent Ford had good reason to believe that the man taken into custody by the Middletown police was Roscoe Ford. When defendant denied he was Roscoe Ford, Agent Ford had the right and the duty to determine whether the man taken into custody was or was not the man named in the warrant in order that if he was not Roscoe Ford he could be released and if he was Roscoe Ford he could be held. This was not the dragnet procedure described and condemned by the decision in Davis v. Mississippi, 394 U.S. 721, 722, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), where the police took numerous persons into custody and fingerprinted them in order to try to match the fingerprint found at the scene and where there was no probable cause to arrest any of the suspects prior to the time they were taken into custody. In the instant case the defendant was in lawful custody and taking his fingerprints so as to identify him as either being Roscoe Ford or not was permissible. Schmerber v. California, 384 U.S. 757, 764, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); United States v. Wade, 388 U.S. 218, 223, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); see also, Propriety of Requiring Accused to Give Hand-

writing Exemplar, 43 A.L.R.3d 653, 657 (1972). The point is overruled.

■ The "threats and coercion" defendant relies upon in support of his second contention that the confession was involuntary consist of the statement made by Agent Ford to Roscoe that since Roscoe did not have his draft card he could be arrested for violation of the Selective Service Act and fingerprinted. This statement was made by Agent Ford during the time defendant was claiming to be Tyrone Carson and was obviously made to persuade defendant to either produce some identification to substantiate his claim that he was Tyrone Carson or to be fingerprinted for the purpose of determining his true identity. Agent Ford's statement cannot be reasonably construed to constitute a threat that bore any relationship to defendant's subsequent action in giving an oral statement to the F.B.I. agents. The point is overruled.

■ Defendant's third ground in support of his motion to suppress his confession is that he was not sufficiently advised of his rights and did not adequately waive his rights under the U.S.Constitution, Amendment 5.

Agent Ford testified that defendant was orally advised that he had a right to an attorney, a right to remain silent, and if he could not afford an attorney the judge would give him an attorney; that a "Rights and Waiver" form was read to defendant, that the form was given to defendant to read and sign, and defendant did so. Thereafter defendant gave the oral statement and did not ask for an attorney. Before the confession was admitted into evidence, Agent Ford again testified that the "Rights and Waiver" form, set forth above, was read to defendant before any questions were asked of defendant concerning the offense. The court did not error in overruling defendant's motion to suppress nor in admitting the confession into evidence. The point is overruled.

■ Defendant's fourth point is, "Hearsay evidence on the issue of whether a robbery was committed by appellant was permitted by the trial court which prejudiced the appellant." In support of this point, defendant cites five excerpts from the record which he contends constituted hearsay evidence that a robbery took place at the cafe. In each instance the evidence was admitted over defendant's objection of hearsay. In only one of the instances was robbery mentioned. This occurred during the testimony of Detective Van Buskirk who was one of the officers who went to the scene of the crime. He was asked what his purpose was in going to Johnny's Lunch. Defendant objected on the grounds the question called for hearsay and the objection was overruled. Detective Van Buskirk stated he heard the call on his radio; that "[t]he call came out as a hold-up in progress and shooting. I headed that way and five minutes later I received a direct call to go to that location, to me, on a possible homicide."

The question called for hearsay and the answer was hearsay. The objection should have been sustained; however defendant was not prejudiced. There was other substantial evidence that a robbery was attempted and did occur during which John Harsh was killed. We do not believe that reasonable jurors would construe Detective Van Buskirk's testimony as evidence that a robbery did occur, but rather that he was merely being ordered to go to the cafe. State v. Kirkland, 471 S.W.2d 191 (Mo. 1971); State v. Chernick, 278 S.W.2d 741 (Mo.1955); and State v. Chernick, 280 S. W.2d 56 (Mo.1955), cited by defendant, are cases in which the hearsay testimony was relied on heavily by the state to identify the defendant as the person who committed the crime and in which there was very little, if any, other evidence that connected the defendants in those cases with the offense with which they were charged. The point is overruled.

Defendant's fifth point is, "The trial court abused its discretion by refusing to

disqualify three veniremen who were biased against the appellant." The three veniremen were panelists Nos. 26, 57, and 8. None of them were selected as jurors in this case as the defendant exercised three of his peremptory challenges to strike them from the panel.

Panelist No. 26 stated, in answer to defense counsel's questions, that he understood that all elements of the offense must be proven by the state beyond a reasonable doubt. Defense counsel continued with the voir dire of this panelist as follows:

"MR. SCHWARZ: All right. I will try to phrase it a different way, Your Honor.

You understand that the charge must be proven beyond a reasonable doubt?

"VENIREMAN_____: Yes, sir, I assume it does.

"MR. SCHWARZ: And if you were not satisfied about that, even [though] the State presented some evidence of guilt, would you then vote not guilty?

"VENIREMAN_____: I would have to give that a lot of thought. I really couldn't answer that truthfully.

"MR. SCHWARZ: Do you believe you understood me correctly?

"VENIREMAN_____: Why don't you try me one more time.

"MR. SCHWARZ: Are you one of those folks that thinks where there is smoke there has to be fire?

"VENIREMAN_____: Yes, sir, I'll buy that.

"MR. SCHWARZ: Your Honor, I would request he be excused on the basis of his answers.

"THE COURT: Mr. _____, what we are asking from all you jurors is that you have an open mind in the case. Certainly if the evidence is not sufficient for a conviction none should be made, and that is what we are trying to determine here from you, if this is a weak case, then, of course they have not made it beyond a reasonable doubt, so the man is entitled to that, or the defendant is entitled to the presumption of innocence and to be proven guilty beyond a reasonable doubt throughout the case.

"Of course, after the jury has it, they may make up their mind from the evidence of the case. We want to know from you if the case, if everything, if proven beyond a reasonable doubt, would it go for the benefit of the defendant, that is what he is trying to ask you.

"VENIREMAN_____: I wouldn't— It would have to be proven one way or the other. I don't know, you have got me all confused.

"THE COURT: In other words, you believe in the law which says he must be proven guilty by a preponderance of the evidence?

"VENIREMAN_____: Yes.

"THE COURT: I think he understands. Proceed.

"MR. SCHWARZ: I do ask for his removal from the panel.

"THE COURT: I think he understands and I am not going to remove him. I overrule the objection."

Defendant contends that panelist No. 26 stated he would require evidence to alter the opinion he formed from knowing a charge of murder in the first degree was brought against defendant and that the court compounded the error by stating the defendant must be proven guilty by a *preponderance of the evidence.*

■■■ The court does not agree with defendant's conclusion that panelist No. 26 would require evidence from the defense nor that the panelist had formed any opinion about the case. The trial court is vested with considerable discretion in ruling a

challenge for cause. State v. Wilson, 436 S.W.2d 633, 637 (Mo.1969). The court did not abuse its discretion. The remark of the trial court about preponderance of the evidence obviously went wholly unnoticed as defense counsel did not even object. The jury was properly instructed on the burden of proof along with the other instructions at the close of the evidence.

■ Defendant contends the court erred in refusing to sustain the defendant's challenge for cause as to panelist No. 57. The record reflects that there was no challenge for cause made as to panelist No. 57 and, therefore, the contention is not preserved for review.

With respect to panelist No. 8, the record reflects that defense counsel asked panelist No. 8 if he would require Mr. Ford to satisfy him of his innocence to which the panelist replied, "It is my understanding that he is innocent until proven guilty by the State." Defense counsel asked two more questions to which the panelist responded by saying that he did not understand the first question and he didn't see how he could answer the second question with a yes or no. Defense counsel requested that the panelist be excused for cause and the court responded by repeating the panelist's answer. Defense counsel again requested that the panelist be excused for cause and the court responded that the court would not do so at that time because the panelist had not answered the question put to him. Defense counsel then continued with his examination of the panelist and made no further challenge for cause as to panelist No. 8. Defendant's fifth point is overruled.

Defendant's sixth point is, "The trial court's failure to give an instruction on second degree murder was prejudicial to the appellant for the reason that there was evidence in the case to support the giving of such an instruction." The case was submitted to the jury under the first-degree felony-murder statute, § 559.010, RSMo 1969, V.A.M.S. on the basis that the killing

of John Harsh occurred during the course of a robbery participated in by defendant.

It is defendant's position that the statement defendant gave to Agent Ford and put in evidence by the state through the testimony of Agent Ford entitled defendant to a second-degree-murder instruction. The substance of Agent Ford's testimony relied on by defendant in support of this point is that defendant did not say he pointed his gun at anyone; that he did not say anything about anyone else pointing guns at anybody and demanding money; that he did say that after he and Mel were in the cafe the younger cafe employee started shooting before anyone else did; that he came in contact with a small sum of money on the floor but did not recall if he picked it up or how he came into possession of it; that he was hazy about where the money came from; that he did not say anything about anyone else taking any money from the cafe; that defendant did not say he planned on going into Johnny's Lunch; and that defendant stated he did not fire a shot but was hit by a bullet, fell to the floor, and had to be carried out.

Defendant argues that the foregoing constituted evidence that neither he nor his companions acted in a cool state of the blood, and that there was no robbery in progress when the shooting started. Defendant also argues that the evidence was not sufficient to sustain a finding that a robbery occurred.

■ The court holds that there was sufficient evidence to sustain a finding by the jury that a robbery occurred and that John Harsh was killed in the course of that robbery. The statement Agent Ford said defendant gave him has been set forth above. If that statement is believed, it leads to only one conclusion, i. e., defendant and his companions went into the cafe armed with two pistols and a shotgun with the intent to commit a robbery. The defendant's confession and the other evidence in the case were sufficient to support a finding by the jury that defendant and his

companions did commit the robbery and Harsh was killed in the course of that robbery.

■ Defendant's reference to "cool state of the blood" refers to deliberation which is an essential element of murder in the first degree. However, when a homicide is committed in the course of one of the felonies set forth in § 559.010 RSMo 1969, V.A.M.S., the commission of the named felony—here robbery—substitutes for the classical elements of murder in the first degree and it is not necessary that the jury find deliberation with respect to the homicide. State v. Owens, *supra,* 486 S.W.2d at 466; State v. Bradley, 361 Mo. 267, 234 S.W.2d 556, 563 (1950).

■ Defendant's reliance upon State v. Jasper, 486 S.W.2d 268 (Mo. banc 1972) and State v. Ayers, 470 S.W.2d 534 (Mo. banc 1971), is misplaced. In *Jasper* the court held that where a homicide is committed in the course of a felony, other than those named in § 559.010, the offense is murder in the second degree under the common law felony-murder rule. In the instant case the evidence supported a finding that the felony of robbery was being committed during which the homicide occurred but there was no evidence the homicide was committed in other circumstances. State v. Bradley, *supra,* 234 S.W.2d at 563. In *Ayers* the court held that where defendant is charged with second-degree murder and there is an entire absence of evidence upon which to rest a verdict of guilty of manslaughter, the court could properly instruct the jury only on murder in the second degree. In the instant case the defendant was either guilty of participating in a robbery during which a homicide occurred and thereby guilty of murder in the first degree, or he was not guilty. The court did not err in refusing to instruct on murder in the second degree.

Defendant's seventh point is that the court erred in refusing to give an instruction on manslaughter. This point is overruled for the reasons stated under point six.

Defendant contends "The trial court erred in admitting testimony of Herbert Binsbacher in identifying pellets he recovered at the crime scene because no proper foundation was made and no showing was made that the chain of custody of the pellets was unbroken and there was no identification made by him of the pellets themselves." Officer Binsbacher of the Kansas City Police Firearms Identification Unit testified that he went to the cafe shortly after the homicide and found several pellets which he identified as number six size shotgun pellets, five .32 caliber bullets, and other spent bullets. No. 6 shot was also recovered from the body of John Harsh. The officer marked the .32 caliber bullets when he found them and identified the .32 caliber bullets in court as the same ones he recovered from the cafe.

■ About one year prior to this trial, this same officer testified in another case involving the same crime; the shotgun pellets and .32 caliber bullets that he found at the scene were admitted into evidence in that case. Thereafter, and until the time of this trial, they had been in the custody of the court and the custody of the prosecuting attorney. Defendant's objection to the admission into evidence of these items is based upon the fact that they were out of the custody of the officer—that the chain of custody had been broken. The shot was not marked because it was too small and there was no testimony that it came from any particular gun. The officer, as stated, identified the .32 caliber bullets as the same ones he recovered at the scene by the markings he put on those bullets at that time. The .32 caliber bullets were sufficiently identified, and the court did not err in admitting them into evidence.

■ The shotgun pellets themselves were no different than any other No. 6 shot. The officer could have testified to finding the pellets and describing where they were found with or without the pellets being admitted into evidence. The court did not err in admitting the shotgun pellets into evidence.

Defendant contends the death penalty cannot be carried out under the United States Supreme Court holding in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 179 (1972). The death penalty cannot be carried out. Furman v. Georgia, *supra;* Duisen v. Missouri, 408 U.S. 935, 92 S.Ct. 2855, 33 L.Ed.2d 749 (1972); Terry v. Missouri, 408 U.S. 940, 92 S.Ct. 2876, 33 L.Ed.2d 763 (1972). The sentence is hereby reduced to life imprisonment. State v. Cuckovich, 485 S.W.2d 16, 28 (Mo. banc 1972).

It is ordered that the clerk of this court forthwith forward a certified copy of this order and judgment to the Warden of the Missouri State Penitentiary at Jefferson City, Missouri, and the Missouri Department of Corrections, Jefferson City, Missouri.

As modified the judgment of the circuit court is affirmed.

All of the Judges concur.