**STATE of Missouri, Plaintiff-Respondent,**

v.

**Terry Joe GREENHAW, Defendant-Appellant.**

No. 10522.

Missouri Court of Appeals, Springfield District.

June 21, 1977.

John C. Danforth, Atty. Gen., Robert L. Presson, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Ortrie D. Smith, Gerald D. McBeth, Ewing, Ewing, Carter, McBeth & Smith, Nevada, for defendant-appellant.

Before BILLINGS, C. J., and STONE and TITUS, JJ.

BILLINGS, Chief Judge.

Defendant Terry Joe Greenhaw was convicted of first degree murder and sentenced to life imprisonment for the shotgun slaying of his 16-year-old pregnant and estranged wife. We affirm.[1]

Because of the nature of defendant's various assignments of trial errors, it is necessary to set forth the facts in some detail even though the defendant only questions the sufficiency of the evidence to support his conviction insofar as it relates to his defense of mental disease or defect excluding responsibility.

Defendant, 21 years of age at time of trial in 1975, and Lee Ann Ayers were

---

1. Defendant's first notice of appeal was not timely filed and dismissed. *State v. Greenhaw,* 542 S.W.2d 788 (Mo.App.1976). Thereafter, we permitted defendant to file notice of appeal out of time. Rule 28.07, V.A.M.R.

married in June, 1973. She was pregnant when they separated four months later and divorce proceedings, initiated by the defendant, were pending in February, 1974. Lee Ann, then six-months pregnant, was living with her parents in El Dorado Springs, Missouri, and the defendant was residing in Clinton, Missouri, with his maternal grandparents.

Sometime before Friday, February 22, 1974, the defendant prepared a letter to his grandparents. He wrote he was going to see Lee Ann at her parents' home Friday morning and when no one else was there he was going to kill her by strangulation or knifing. He said he planned to buy a .12 gauge shotgun and a box of shells and kill himself after he killed his wife. This letter was later found on March 2, as described infra.

Friday morning, February 22, the defendant borrowed his grandfather's pickup truck for the purpose of going to El Dorado Springs. He was to return the truck by 1 p. m. that day. Before leaving Clinton he went to a Wal-Mart store and purchased a .12 gauge shotgun and a box of Federal, No. 6 shot, shotgun shells.

Lee Ann knew the defendant planned to come to El Dorado Springs Friday morning and did not want to meet him at her parents' home. She left him a note on the door telling defendant she had gone downtown and would be at the cafe or drugstore. She accompanied her mother to the cafe where Mrs. Ayers was employed. The note was dated "2–22–74."

Lee Ann was in the cafe when the defendant arrived there about 11:30 a. m. They sat in a booth talking for twenty minutes or so before leaving the cafe together. Lee Ann told her mother she had some errands to run and would return in about thirty minutes. Lee Ann was wearing her gold-rimmed, tinted, prescription glasses.

About 1:30 p. m. two transient telephone cable installers found gold-rimmed, tinted, prescription glasses on a gravel road a short distance west and north of El Dorado Springs. One of the workmen stuck the glasses in his pocket and later put them in the motel room where he was staying.

The morning of February 23 Mr. Ayers notified the El Dorado Springs police his daughter was missing and the circumstances of her disappearance. Later that day he notified the Cedar County Sheriff's office of Lee Ann's disappearance after leaving the cafe with the defendant. He also contacted a member of the Missouri Highway Patrol and juvenile authorities. Police in Clinton and Kansas City, as well as the Federal Bureau of Investigation, were alerted.

On February 23 the defendant's grandfather reported his pickup truck was missing. The defendant had not returned the truck and the grandfather had not seen or heard from the defendant since he left with the truck the day before.

The night of February 23 the defendant checked into a Clinton motel, volunteering to the clerk that his car was stuck in the city park. He spent that night, the following day, and a second night at the motel.

By March 2 the missing girl was the subject of a search by city, county, state and federal authorities. The defendant could not be located by officers. On that day the grandfather's truck was found stuck in a field near Clinton. Inside the truck was an empty Federal, No. 6 shot, shotgun shell box and defendant's letter to his grandparents.

On March 4 Cedar County officials had an arrest warrant issued for the defendant, charging him with the abduction of Lee Ann. This information was placed into the computer of the National Crime Information Center.

Early in the morning of March 8 the telephone worker, by reason of an article in a newspaper concerning the missing girl, took the gold-rimmed glasses to the El Dorado Springs police station. The glasses were taken to Mrs. Ayers who identified them as belonging to her daughter. Officers began searching the area where the glasses had been found and at 9:30 a. m. one of them found a fired Federal, No. 6 shot, shotgun shell nearby.

At 9:45 a. m. that morning, Blue Springs, Missouri, police officer and city juvenile officer Vasquez saw four individuals walking along a state highway within the city limits. Because it was a school day and the foursome appeared to the officer to be in their mid-teens, the officer thought they were truants and asked them for identification. In checking the names of the quartet by radio, the officer was advised that three of the persons had "juvenile jackets" and that defendant was wanted for the abduction of his wife by Cedar County authorities. The officer asked defendant if he knew of the warrant for his arrest. The defendant replied "no." The officer then radioed his dispatcher, requesting confirmation that the warrant was still outstanding. Cedar County officials were called and they advised the warrant was still active and "it might be a possible homicide." The officer placed the defendant under arrest and read him Miranda warnings. The officer asked the defendant if he knew the whereabouts of his wife and the defendant told him he thought she was out of the state.

The defendant was transported to the Blue Springs police station where he was booked and searched. In his billfold was the note Lee Ann had left for him on her door on February 22. The defendant had circled the date and above it had written "she died."

At 11 a. m., March 8, Lee Ann's body was found in a roadside ditch near where her glasses and the expended shotgun shell had been found. She had been shot in the neck at close range by a shotgun.

Cedar County officers notified Blue Springs officers of the homicide and asked them to find out if defendant had a shotgun. He was again given *Miranda* warnings and when asked if owned a shotgun he told the interrogating officer of his purchase of the shotgun. He said he had hidden it and the remaining shells near Clinton and drew a rough map of the location of the gun and shells. The officer asked the defendant if he had killed his wife. The defendant said he did not want to talk about killing his wife but would talk about anything else.

Officers found the shotgun and 24 Federal, No. 6 shot, shotgun shells where defendant said he had hidden them. The empty shotgun shell found near the body had been fired by the defendant's shotgun.

Defendant was thereafter charged with the murder of his wife and entered pleas of not guilty and not guilty by reason of mental disease or defect excluding responsibility. He was examined on two occasions by doctors at the state facility at Fulton and by a psychiatrist of his own selection. By way of defense at trial, the defendant's grandmother and psychiatrist testified. Their testimony was directed towards the defense of not guilty by reason of mental disease or defect excluding responsibility.[2]

■ Defendant's first point is that the testimony of his expert medical witness rebutted the statutory presumption of sanity contained in § 552.030(7), V.A.M.S., by a preponderance of the evidence and thus his conviction cannot stand.

The applicable portion of § 552.030(7), reads: "All persons are presumed to be free of mental disease or defect excluding responsibility for their conduct, . . . The issue of whether any person had a mental disease or defect excluding responsibility for his conduct is one for the *jury* to decide upon the introduction of substantial evidence of lack of such responsibility. But in the absence of such evidence the presumption shall be conclusive. Upon the introduction of substantial evidence of lack of such responsibility, *the presumption shall not disappear and shall alone be sufficient to take that issue to the jury.*" (Emphasis ours).

The defendant's psychiatrist voiced the opinion that at the time of the killing the defendant had a mental disease or defect excluding responsibility for his conduct. Conceding this testimony to be substantial evidence, and absent contrary evidence by the state, the statute requires resolution of

---

**2.** Inter alia, their testimony indicated defendant had a "drug problem" since age 12.

the sanity issue by the jury because the presumption remains in the case. *State v. King,* 526 S.W.2d 58 (Mo.App.1975). In such a situation a jury could reject the testimony of a psychiatrist and the presumption alone would support a conviction. Here, the state, in addition to the presumption, countered with testimony of a psychiatrist who was of the opinion that defendant was free of mental disease or defect excluding responsibility on the date of the killing. The defendant's argument ignores the statutory presumption as well as the state's rebutting evidence on the issue of mental disease or defect excluding responsibility. The point is denied. *State v. Thornton,* 532 S.W.2d 37 (Mo.App.1975).

Defendant complains the trial judge was guilty of an abuse of discretion in asking a series of questions of defendant's psychiatrist following lengthy direct and cross-examination of the witness.

We have carefully reviewed the questions the judge directed to the witness and are of the opinion no reasonable jury could have obtained any impression other than that the court was seeking to clarify the doctor's earlier testimony and to elicit more specifically the basis of his expert opinion.

"[T]he questions by the court asked of appellant did no more than tend to explain or add to the understanding of the testimony already given. Such questions by the court are proper where the purpose is to develop more fully the truth and to clarify testimony already given." *State v. Cain,* 485 S.W.2d 60 (Mo.1972); *State v. Snow,* 541 S.W.2d 11 (Mo.App.1976).

Defendant made no objection to the court's questions. The general rule requires an objection to preserve such alleged error. *Bova v. Bova,* 135 S.W.2d 384 (Mo. App.1940); 98 C.J.S. Witnesses § 347 (1957). In any event, no prejudicial error appears in the record. The point is denied.

Defendant's next two points assert the trial court erred in denying his motion to suppress evidence. He first contends his being stopped by the Blue Springs police officer was an unlawful seizure and all evidence seized as a result of the arrest which followed should have been excluded at his trial. The second prong of his Fourth Amendment attack on the lower court's ruling is that his arrest was unlawful because it was based upon an invalid arrest warrant and therefore evidence obtained as the result of the arrest was tainted.

Defendant's points do not reveal the specific items of evidence of which he complains. Neither does the argument portion of his brief. His motion to suppress sought exclusion of " . . . [A]ll property, documents, writing, maps, notes, articles of clothing, ammunition, guns, ballistic test results, statements made by defendant, and any other property, of whatever nature, taken from defendant or located by virtue of statements or diagrams prepared or given by defendant subsequent to the time of defendants [sic] arrest . . . ."

In view of the gravity of the offense for which the defendant was convicted, we have, in the exercise of the discretion afforded us by Rule 84.08, V.A.M.R., decided to undertake review of these alleged constitutional infirmities, ignoring the defendant's violation of Rule 84.04, V.A.M.R.

Defendant argues Officer Vasquez violated his Fourth Amendment rights by stopping him and his companions; that the stopping, without probable cause, was an illegal seizure; and, the illegal stopping-seizure and subsequent arrest contaminated "any evidence" thereafter obtained.

We are of the opinion that the officer's inquiry for identification, involving at most a momentary detention, was reasonable under the circumstances and did not do violence to the defendant's constitutional rights. The officer saw four individuals who appeared to be juveniles in their mid-teens, walking along the highway, within the city limits of Blue Springs, on a day when school was in session and at a time when juveniles were supposed to be attending school. In addition to his duties as a police officer, Officer Vasquez was also city juvenile officer. He thought the foursome were juvenile truants.

At the suppression hearing, the defendant acknowledged the three persons with him were "younger" than he was and were "possibly" juveniles under the age of 17 years. Defendant said he was "high" on a drug and that he and his companions had caught a ride from Kansas City to Blue Springs, en route to Springfield by way of Clinton. He stated the officer got out of his car and "asked us if we had any identification." The defendant displayed his driver's license. The officer asked him to wait in front of the car with the others while he used his car radio. The officer returned then arrested the defendant, advising him he was wanted for kidnapping.

The defendant's reliance on *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to support his contention that he was unlawfully seized by the officer prior to his arrest, is misplaced. *Terry v. Ohio* was a "stop and frisk" situation in which as a result of the frisk a weapon was found and the defendant arrested. In footnote 16, page 20, 88 S.Ct. page 1879, the court stated: "We thus decide nothing today concerning the constitutional propriety of an investigative 'seizure' upon less than probable cause for purposes of 'detention' and/or interrogation. *Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons.*" (Our emphasis).

In concurring in *Terry,* Mr. Justice White said: "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." 392 U.S. at 34, 88 S.Ct. at 1886.

In Missouri school attendance is compulsory for children between the ages of seven and sixteen years. § 167.031 and § 167.051 RSMo 1969. Parents or guardians who violate the statutes are subject to prosecution for a misdemeanor. § 167.061 RSMo 1969. The juvenile courts are vested with jurisdiction of children whose parents or other persons legally responsible neglect or refuse to provide "education which is required by law." § 211.031 RSMo 1969. In certain school districts city or county police are by statute deemed to be ex officio school attendance officers. § 167.071 RSMo 1969.

Here, one who was not only a police officer but also the city juvenile officer saw four young people walking along the highway in Blue Springs. They appeared to be juveniles. School was in session. The officer stopped his car and asked the four for identification. The defendant showed him his driver's license. A radio check revealed defendant was wanted by Cedar County officials. The officer then arrested defendant.

In our view, the actions of Officer Vasquez were reasonable. He had reasonable grounds to believe defendant and his companions were truants and to direct questions to them concerning their identity. His request for identity information, which was given to him, did not result in a "seizure" of the defendant's person in violation of the Fourth Amendment.

We turn now to the defendant's contention that his arrest was unlawful because the arrest warrant was based upon an insufficient complaint and consequently evidence thereafter obtained was tainted and subject to suppression.

■ The complaint and warrant have not been filed with us. Defendant's brief sets forth what purports to be a copy of the complaint filed with the magistrate which was the basis for the arrest warrant of March 4, 1974, of the defendant for kidnapping. We are referred to *Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), by the defendant in support of his contention and agree that under the decision in that case a complainant seeking an arrest warrant must set forth sufficient facts from which the magistrate can base an independent judgment of probable cause, rather than simply a conclusion of the complainant that one committed a crime. Defendant argues the complaint signed by the sheriff of Cedar County is insufficient as a matter of law to authorize the issuance of the arrest warrant.

■ We do not deem it necessary to rule defendant's contention regarding the invalidity of the arrest warrant because at the

moment of defendant's arrest in Blue Springs there was in fact probable cause for his arrest. Whether an "arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964).

In *State v. Kerr,* 531 S.W.2d 536 (Mo.App. 1975), the court said:

"Case law has established that when a law enforcement agency or officer requests another such agency or officer to arrest a suspect on a particular charge, the arresting agency or officer then has probable cause to sustain the validity of the arrest; that validity of the arrest is determined by existence of probable cause for the arrest in the demanding authority, and invalidity of an existing arrest warrant does not render an arrest invalid when the arresting and demanding authorities otherwise have probable cause for the arrest. *State v. Owens,* 486 S.W.2d 462 (Mo.1972); *State v. Ford,* 495 S.W.2d 408 (Mo. banc 1973); and *Young v. United States,* 344 F.2d 1006 (8th Cir. 1965), recognize that an arresting officer need not have personal knowledge of the facts constituting probable cause in order to make a valid arrest upon the request of one who possesses probable cause. *Go-Bart Importing Co. v. United States,* 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931); *Dearinger v. United States,* 378 F.2d 346 (9th Cir. 1967); *State v. Stuart,* 456 S.W.2d 19 (Mo. banc 1970) (reversed on other grounds); and *Whiteley v. Warden,* supra, recognize that an arrest, although backed by an invalid warrant, is a lawful arrest if the demanding authority had probable cause for the arrest."

The court in *United States v. Stratton,* 453 F.2d 36 (8th Cir. 1972), cert. denied, 405 U.S. 1069, 92 S.Ct. 1515, 31 L.Ed.2d 800, said:

"We think the knowledge of one officer is the knowledge of all and that in the operation of an investigative or police agency the collective knowledge and the available objective facts are the criteria to be used in assessing probable cause. The arresting officer himself need not possess all of the available information. As stated in *Stassi v. United States,* 410 F.2d 946 (5th Cir. 1969), 'The officers involved were working in close concert with each other, and the knowledge of one of them was the knowledge of all. *United States v. Romero,* 2d Cir., 249 F.2d 341, 374' *Id.* at 952, n. 7."

■ In *State v. Morris,* 522 S.W.2d 93, 96 (Mo.App.1975), the court stated "that when a police officer makes an arrest on the basis of a message received over the police radio, the question of probable cause is to be adjudged upon the full information which caused the message to be sent and not on the message alone." The court held this rule applied equally to telephone communications between police officers. Thus, an officer who receives directions to arrest from other officers who have probable cause can make a valid warrantless arrest. *State v. Owens,* 486 S.W.2d 462, 465 (Mo. 1972); *State v. Granberry,* 530 S.W.2d 714, 725 (Mo.App.1975); *State v. Bradley,* 515 S.W.2d 826, 828 (Mo.App.1974).

■ The collective knowledge of the officers in the instant case demonstrate probable cause for the defendant's arrest. Information in their possession at the moment of arrest included the following: defendant and his wife were having marital problems, a divorce was pending and they were living separate and apart; she was afraid of defendant and did not want to meet with him alone at her parents' home; she was last seen on February 22 with the defendant and told her mother she would return in thirty minutes; her glasses were found an hour and one-half later on a country road; the defendant was to have returned his grandfather's truck by one o'clock that day and the truck was found abandoned eight days later; the defendant could not be

found; the defendant had prior to February 22 written he was going to buy a certain gauge shotgun and shells and kill his wife; the letter was found in the truck, along with an empty shotgun shell box; a search by area law enforcement officers had failed to locate the missing wife; a fired shotgun shell of the same brand, gauge and size shot of the shell box found in the truck was found near where the girl's glasses had been found.

Since the officers investigating Lee Ann's sudden and unexplained disappearance had probable cause to believe she was the victim of criminal action by the defendant they could direct the Blue Springs officer to arrest him. His arrest of the defendant without a warrant was valid even though he personally did not have knowledge of all the facts establishing probable cause for a warrantless arrest. The arrest being lawful, the search of defendant as an incident thereof was permissible and items seized proper evidence. The points are denied.

The defendant's next point avers the judgment of the trial court should be set aside for the reason the prosecuting attorney was without authority to file an information, and therefore the information he did file was invalid and without force and effect.

■ Again, we are confronted with the point failing to inform us what action or ruling of the trial court is sought to be reviewed. Rule 84.04(d). Looking to the argument portion of the defendant's brief and pre-trial colloquy of counsel in the transcript, we are able to glean that at defendant's first preliminary examination on the murder charge the hearing magistrate found "no probable cause." Thereafter, a new murder complaint was filed and a second preliminary hearing resulted in defendant's being bound over to circuit court. The prosecutor's information, charging the defendant with the first degree murder of his wife, was filed in circuit court and trial followed.

The case cited by the defendant in support of his contention is persuasive authority against him. In *State v. Thomas,* 529 S.W.2d 379 (Mo.1975), the defendant complained that since he was originally discharged at a preliminary hearing the state could not thereafter obtain an indictment against him for the same offense. In rejecting this contention, the supreme court adopted the general rule found in 21 Am. Jur.2d, Criminal Law, § 450, at 452–453, which states that a discharge at a preliminary hearing does not bar the filing of a new complaint with another magistrate and does not bar a prosecution of the alleged offense by indictment.

The defendant argues the ruling in *Thomas* limited the state in the instant case to seeking an indictment. The rule permits alternative methods of proceeding after a discharge at a preliminary hearing. The point is denied.

■ The defendant next alleges the trial court erred in overruling his objection to the testimony of the state's expert that pellets taken from the victim's body were size 6 shot based on comparisons with a shot chart provided by Federal.

The witness, a ballistics expert of the Missouri Highway Patrol laboratory in Jefferson City, testified he weighed the shot [removed from Lee Ann's neck] and by dividing the total weight by the number of shot he was able to arrive at an average weight of 1.85 grams per pellet. He stated that by checking various manufacturer weight charts as to size of shot he was able to arrive at a conclusion the shot was No. 6 and within the range "probably for a Federal Ammunition number 6 shotgun pellet."

Defendant argues the witness' reliance on a shot size chart is hearsay and denied him Sixth Amendment rights to confrontation and cross-examination.

In 31 Am.Jur.2d, Expert and Opinion Evidence, § 66, at 575, the rule is stated as follows:

"The rule restricting the use of scientific and medical books as evidence does not restrict the scope of opinion testimony of expert witnesses although their opinions may, in some degree, be founded on scien-

tific books or may have been reached through a study of standard publications on the subject in hand. Experts, in giving opinion testimony, may refer to scientific authorities and state the result thereof. Such reference is not deemed an introduction of the books in evidence, but rather, to be a means of enabling the witness to refresh his memory or to corroborate his own opinions. Thus, it is held that the expert may certify his testimony by reference to books or documents covering matters of law, medicine, or other branch of science."

As noted by *Wigmore,* to allow an expert to rely upon published or reported data is a matter of necessity and to rule otherwise would set impossible standards with regard to proof. 2 Wigmore, Evidence, § 665b (3rd Edition 1940).

Here, by reason of his expertise in the ballistics field, the witness could have simply testified that because of the weight of the shot it was his opinion the pellets fell within the range of No. 6 shot of Federal, without any reference to a chart. Weights of various brands of shotgun shot were within the witness' field of ballistics and his peculiar knowledge as an expert in that field. We do not find error.

This brings us to defendant's final assignment. He urges reversal because the court failed to give a manslaughter instruction.

■ Defendant was tried after March 1, 1975, and under the Amended Notes on Use to MAI–CR 6.02, an instruction on manslaughter should have been given, in addition to instructions on murder in the first and second degree. However, this point is not mentioned in defendant's motion for new trial and as a result has not been preserved for review. *State v. Newman,* 514 S.W.2d 527 (Mo.1974); *State v. Merritt,* 540 S.W.2d 183 (Mo.App.1976).

■ In his brief the defendant does not seek review under the plain error doctrine found in Rule 27.20(c), V.A.M.R. Nevertheless, we have concluded to review the failure of the trial court to give a manslaughter instruction to determine whether such omission resulted in manifest injustice or miscarriage of justice. If not, even though error, reversal is not warranted. *State v. Sanders,* 541 S.W.2d 530 (Mo. banc 1976); *State v. Brown,* 543 S.W.2d 796 (Mo.App. 1976).

■ Rule 20.02(e), V.A.M.R., provides that the giving or failing to give an MAI–CR instruction is not per se prejudicial. The jury was instructed upon both murder in the first and second degree and returned a verdict of first degree murder. Under the instructions given, the jury could not have considered second degree murder until they first acquitted the defendant of murder in the first degree. If a manslaughter instruction had been given, the jury could not have considered that offense until they had acquitted the defendant of both murder in the first and second degree. Not having taken the first step in reducing the offense, the jury could not, under the instructions, have considered a manslaughter instruction, even if given.

Defendant does not attempt to point out any prejudice by reason of the omission of the manslaughter instruction, nor does he set forth any facts which, prior to March 1, 1975, would have necessitated such an instruction.

We have re-reviewed the transcript in its entirety. We conclude the error in failing to give a manslaughter instruction did not result in manifest injustice or miscarriage of justice and the plain error doctrine is not applicable.

Judgment is affirmed.

All concur.