STATE of Missouri, Respondent,

v.

Eural K. SNOW, Jr., Appellant.

No. 28171.

Missouri Court of Appeals,
Kansas City District.

July 6, 1976.

Motion for Rehearing and/or Transfer
Denied Aug. 2, 1976.

Application to Transfer Denied
Oct. 12, 1976.

Thomas M. Larson, Public Defender, Lee M. Nation, Asst. Public Defender, Kansas City, for appellant.

John C. Danforth, Atty. Gen., Charles L. Howard, Asst. Atty. Gen., Jefferson City, for respondent.

Before TURNAGE, P. J., and WELBORN and HIGGINS, Special Judges.

ROBERT R. WELBORN, Special Judge.

A jury in the Jackson County Circuit Court found Eural K. Snow guilty of murder in the first degree under the felony murder doctrine and fixed the punishment at life imprisonment. After judgment and sentence, this appeal followed.

A holdup occurred at the Retreat Tavern in Kansas City on January 15, 1975. The robbers were armed with pistols and when a patron scuffled with one of the robbers, the robber struck the patron with the gun and it discharged, causing minor injuries to the patron. A waitress was shot by the other robber. She died from her wounds. The patron who had scuffled with the robber identified a police photograph of Eural Kenneth Snow as the person with whom he scuffled. When he learned that police were looking for him, Snow surrendered to police officers who took him to police headquarters. There Snow gave a complete statement in which he admitted his participation in the robbery and named his accomplice as the person who shot the waitress.

At Snow's trial on a charge of murder in the first degree, the patron who had scuffled with Snow identified Snow as that person. Two other patrons were unable to identify Snow. The state also introduced in evidence, after his motion to suppress had been overruled, Snow's statement which had been reduced to writing and signed by him, in which in response to police questioning, he detailed his part in the robbery.

Snow, testifying on his own behalf, denied that he participated in the robbery. As he had done in support of his motion to suppress the statement which was overruled, Snow testified that at the time of the statement he was suffering from heroin withdrawal symptoms. He denied that he had made the statement attributed to him and said that he signed the report of interrogation without reading it. At the trial he testified that his familiarity with the details of the crime was based upon what Herman Brown had told him about it. According to appellant, Herman was one of the robbers and he told the police what Herman had said about his activities and the police

wrote the report on the basis that appellant had done what he told the police Brown did. He testified that he was at home watching a basketball game at the time of the robbery.

Brown was called as a witness by Snow. The sole point of this appeal relates to the action of the trial court in connection with Brown's interrogation. In order to place the matter in perspective, the entire testimony of Brown is set forth.

"DIRECT EXAMINATION by Mr. Teasdale:

"Q. Would you state your full name, please?

"A. Herman Charles Brown.

"Q. Herman Charles Brown. Mr. Brown, I'm going to ask you please, since the hearing in this room is not very good so speak in a louder tone of voice than you normally would please, so the ladies and gentlemen may hear you and Judge Stubbs as well may hear your testimony. Where do you presently live?

"A. 3729 Bell.

"Q. And right now you are staying where?

"A. Up here in the county jail.

"Q. Jackson County Jail?

"A. Yes.

"Q. Do you know the defendant, Eural Kenneth Snow?

"A. Yes.

"Q. How long have you known him?

"A. Quite a while.

"Q. How long is that, approximately? Five, ten years? How many?

"A. Ain't been no years, you know.

"Q. Six or seven months, maybe?

"A. Yes.

"Q. I see. And I want to direct your attention to a robbery, and a murder that happened in Kansas City in mid-January of this year at the Retreat Tavern. Have you ever heard of that before?

"A. Yes.

"Q. Well, I want to direct your attention to a time when you met with a Mr. Turner, a black man, an investigator for the prosecutor's office. Do you remember meeting with him?

"Yes.

"Q. And didn't you make a statement to him about this case involving Mr. Snow?

"A. Yeah.

"MR. TEASDALE: Excuse me. May we approach the bench?

"(Counsel approached the bench and the following proceedings were had and entered of record:)

"MR. BELLEMERE: I'm not sure what this is going to lead to but I don't want Mr. Teasdale to ask him questions about what he said to some other person.

"THE COURT: No, I don't think that is proper.

"MR. TEASDALE: Your Honor, may I make an offer of proof. I'm not asking for testimony about what someone else said. The facts are that three members—

"MR. BELLEMERE: Wait a minute

"MR. TEASDALE: Can I finish, please? Can I finish my statement?

"MR. BELLEMERE: Yes, except it's pretty loud and I would ask to go outside the hearing of the jury on this matter period.

"MR. TEASDALE: Judge, here are the facts. This man has made statements on two occasions to employees of the prosecutor's office and he said that my client had nothing to do with this. Now, I want him to tell us if he did say that or not. That's not hearsay. I think I'm entitled to that. I'm not going to ask for any hearsay at all and he can be cross-examined further by Mr. Bellemere.

"THE COURT: It's not proper for this fellow to state as his conclusion that the defendant had nothing to do with the robbery and murder. Now, he can testify to what the facts are, what he knows the fact to be.

"MR. TEASDALE: Can I ask him what he told the facts are?

"THE COURT: No, because you're doing the same thing in a back-court way. Not what he told somebody, but what does he know about.

"MR. TEASDALE: All right.

"(The proceedings returned to open court.)

"Q. (By Mr. Teasdale) Mr. Brown, you were questioned by Mr. Turner, were you not, about the case at the Retreat Tavern where that lady was killed?

"A. Yeah.

"Q. And you knew, didn't you, that among other people—

"MR. BELLEMERE: Excuse me, Mr. Teasdale. I want to approach the bench.

"(Counsel approached the bench and the following proceedings were had and entered of record:)

"THE COURT: It's not a question of what he told anybody, counsel.

"MR. TEASDALE: I wasn't going to ask that.

"MR. BELLEMERE: I ask that we go out of the hearing of the jury and have an offer of proof to solve this and that Mr. Teasdale ask this man if he did anything as far as the robbery and homicide personally are concerned. If he is going to exonerate he could do so—

"THE COURT: Do it because he was there.

"MR. BELLEMERE: And not because he told anybody else.

"MR. TEASDALE: I'm only laying the groundwork, Your Honor. He was permitted to put on police officers to lay the groundwork which led up to the conversation with the defendant. I'm only laying the groundwork for the fact that he was asked about it and he had information about in (sic). Then I'm going to ask him what happened.

"THE COURT: Well, go at it the other way. Ask him what happened first.

"(The proceedings returned to open court.)

"Q. (By Mr. Teasdale) Mr. Brown, you knew before today, did you not, that Mr. Snow was charged in connection with the robbery at the Retreat Tavern in January?

"A. Yes.

"Q. And you knew, did you not, that he was charged with others in that same case?

"A. Um-hum.

"Q. Now, do you know whether or not Mr. Snow—do you know whether or not Mr. Snow had anything to do with that robbery at the Retreat Tavern in January of this year?

"A. Yes.

"Q. Did he?

"A. No.

"THE COURT: How do you know that?

"THE WITNESS: I was over at this house that time, you know—

"THE COURT: You were what?

"THE WITNESS: I was over at his house at that time when they said he did it at the approximate time.

"THE COURT: Well, you were not in the tavern where the robbery and the shooting took place?

"THE WITNESS: No.

"THE COURT: So all you know about it is what somebody told you?

"THE WITNESS: No, I was at his house. He was at home at the time.

"THE COURT: At what time?

"THE WITNESS: At the approximate time they said the robbery went on.

"THE COURT: Well, how do you know when the robbery went on?

"THE WITNESS: How do I know?

"THE COURT: Yes.

"THE WITNESS: Because they asked me.

"(Counsel approached the bench and the following proceedings were had and entered of record:)

14 ■

"MR. TEASDALE: Excuse me, Your Honor. Your Honor, I'm going to have to object to the Court's cross-examination of this witness before I get a chance to finish my direct. It seems to me you're doing the work of Mr. Bellemere.

"THE COURT: I'm trying to get this show on the road.

"MR. TEASDALE: Your Honor, it seems to me that I have the right to get his direct examination over with. It seems to me that the Court now with all its prestige is interrupting in the middle of my direct examination and cross-examining for the State.

"THE COURT: I'm just trying to get this fellow to tell the truth. Go ahead with your examination.

"MR. BELLEMERE: Still, getting back to the objection, if this witness is going to exonerate the defendant he would do so by saying that this defendant didn't do it and he did. Now, Mr. Teasdale still hasn't asked that question, and when he does ask him questions they are questions related to what he has done or what he knows, and not what he personally did or saw.

"THE COURT: Well, all I'm saying is that what somebody told him doesn't amount to zip.

"(The proceedings returned to open court.)

"Q. (By Mr. Teasdale) So, Mr. Brown, is it your testimony that you of your own knowledge know that Mr. Snow did not rob the Retreat Tavern in January? Do you know that?

"A. Yes.

"MR. TEASDALE: You may inquire.

"CROSS–EXAMINATION by Mr. Bellemere:

"Q. And if I understood your testimony correctly the reason you know that Mr. Snow did not rob the Retreat Tavern is because at the time he was suppose (sic) to have robbed the Retreat Tavern you and he were at his house and he was at his home then and not at the Retreat Tavern; is that right?

"A. Yes.

"Q. And you, yourself, don't even know where the Retreat Tavern is.

"A. I sure don't.

"Q. And you have never been in it.

"A. No.

"Q. And your name is Herman Brown?

"A. Yes.

"Q. And you don't know anything about the robbery.

"A. No.

"MR. BELLEMERE: Thank you.

"THE WITNESS: What I heard.

"MR. TEASDALE: I have no further questions."

Another jail inmate, Fred Kerr, testified that he was at Snow's house on the day and evening of the Retreat robbery and that Snow did not leave the house. No other evidence was offered by the defense.

On this appeal, appellant contends that the trial court's examination of Brown was an abuse of discretion and left the jury with the impression that the court did not believe appellant's alibi.

The problem in a case such as this is in determining whether the trial court's questions or remarks were such as to give the impression of abandonment of neutrality on the part of the judge and assumption of the prosecutor's role or whether they were aimed merely at attempting to clarify the testimony given. Appellant contends that here the trial court's questioning was within the first category, and constituted a reversible error. In support of his position he cites: *State v. Embry,* 530 S.W.2d 401 (Mo. App.1975); *State v. Wren,* 486 S.W.2d 447 (Mo.1972); *State v. Dixon,* 463 S.W.2d 783 (Mo.1971); *State v. James,* 321 S.W.2d 698 (Mo.1959); *State v. Montgomery,* 363 Mo. 459, 251 S.W.2d 654, 657–658[3] (1952); *State v. Castino,* 264 S.W.2d 372, 374–375[3–5] (Mo.1954); *State v. Drew,* 213 S.W. 106 (Mo.1919); and *State v. Jones,* 197 S.W. 156 (Mo.1917).

The state, of course, takes the alternative position, citing: *State v. Clark,* 522 S.W.2d

332, 334–335[3, 4] (Mo.App.1975); *State v. Pearson,* 519 S.W.2d 354, 357–359[7, 8] (Mo. App.1975); *State v. Cain,* 485 S.W.2d 60, 61–62[2][3, 4] (Mo.1972); *State v. Lay,* 427 S.W.2d 394, 403[11] (Mo.1968); *State v. Crockett,* 419 S.W.2d 22, 26–27[9]–[11] (Mo. 1967); and *State v. Grant,* 394 S.W.2d 285, 286–288[1, 2] (Mo.1965).

In this case, defense counsel adopted a somewhat oblique approach in his examination of Brown. A subsequent colloquy with the court disclosed that defense counsel expected that the witness would testify that he and another person committed the robbery and that appellant was not in the tavern. Defense counsel sought to approach the subject by asking the witness what he had told someone about the crime. Although the court properly sustained objection to such approach, counsel persisted in it and when another objection was sustained, defense counsel propounded the question which called for the witness's conclusion as to whether or not appellant had participated in the crime. Such a conclusion had no evidentiary value and the trial court, in view of the immediately prior problem with defense counsel's interrogation, sought to ascertain the basis for the witness's conclusion. The court's questioning produced the statement that the witness was at appellant's house and appellant was there at the "approximate time" of the robbery. The trial court's questioning does not indicate disbelief of that statement. Appellant does not contend that the remarks of the court to the effect that he was "trying to get this fellow to tell the truth" were made in the presence of the jury and the record indicates otherwise. Contrary to the situation in *State v. Embry,* supra, relied upon by appellant, where the trial court sua sponte prevented a defense witness from answering questions calling for hearsay, in this case the witness gave an answer based upon hearsay which was permitted to stand. The responses elicited by the court were consistent with the testimony of the other alibi witness that he was at appellant's house at the time of the crime and that Brown was also there.

Quite obviously, appellant's alibi was shattered, but it was the result of the failure of his witnesses to testify as appellant expected. Appellant said that Brown was a participant in the robbery. Brown denied that he was. Appellant's other alibi witness placed Brown as well as appellant at appellant's house at the time of the robbery. It might be noted that in examination of the second alibi witness defense counsel apparently sought to impeach Brown, to-wit:

"Q Do you have any personal knowledge of whether or not Herman Brown had any involvement with the Retreat Tavern holdup?

"A Not to my knowledge, I don't.

"Q Didn't you just tell me the opposite upstairs?"

Objection to the question was sustained and the matter was not pursued further. Obviously, the defense wished to discredit Brown, in view of the defendant's testimony that Brown came to his house *after* the robbery and told appellant in detail what he (Brown) had done at the Retreat Tavern.

Viewing the entire circumstances this court cannot say that in this case the trial court abused its discretion in interrogating witness Brown in order to ascertain the basis for the witness's obvious conclusory assertion.

As the court observed in *State v. Wren,* supra, " * * * an area is involved wherein precedent is of little value and each case must be resolved upon its own facts." 486 S.W.2d at 448.

Therefore, no effort will be made to distinguish appellant's authorities. They have been examined and considered, but none is here controlling.

Judgment affirmed.

All concur.