STATE of Missouri,
Plaintiff-Respondent,

v.

Arvin J. GARRETT,
Defendant-Appellant.

No. 11246.

Missouri Court of Appeals,
Southern District,
Division Three.

Feb. 19, 1980.

Motion for Rehearing and Transfer
Denied March 6, 1980.

Application to Transfer Denied
April 8, 1980.

John Ashcroft, Atty. Gen., Richard F. Engel, Steven W. Garrett, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

James R. Reynolds, Ford, Ford, Crow & Reynolds, Kennett, for defendant-appellant.

MAUS, Judge.

On October 11, 1978, a jury convicted the appellant of first degree murder. Following post trial procedures on December 13, 1978, he was sentenced to life imprisonment without parole for fifty years. His notice of appeal was filed on December 19, 1978. The transcript on appeal was filed in this court on January 30, 1979. Mo. Const. Amend. Art. V, § 3, effective January 2, 1979, provides that "where the punishment imposed is death or imprisonment for life" exclusive appellate jurisdiction is in the Supreme Court. The state urges that the case should be transferred to the Supreme Court. Concisely stated, the question is whether appellate jurisdiction is determined by the filing of the notice or by the filing of the transcript. In *Mince v. Mince*, 481 S.W.2d 610 (Mo.App.1972), cited by the state, the court stated that because the transcript had not been filed "our jurisdiction to decide that cause has not yet been engaged." However, that case is not per-

suasive on this point for there the court was speaking of its ability to decide a separate appeal, not its jurisdiction of that appeal. In *State v. Johnson*, 530 S.W.2d 690, 691 (Mo.banc 1975) the Supreme Court assumed jurisdiction "[b]ecause the appeal was filed prior to January 1, 1972," apparently referring to the notice. This is consistent with prior decisions concerning the effective date of an appeal. "The vital step for perfecting an appeal is the timely filing of a notice of appeal under Section 129. Thereupon the appeal becomes 'effective.'" *Weller v. Hayes Truck Lines*, 355 Mo. 695, 700, 197 S.W.2d 657, 660 (banc 1946). It is likewise consistent with V.A.M.R. Civil Rule 81.04 which provides that after a timely notice of appeal the failure of the appellant to perfect the appeal "does not affect the validity of the appeal," but is the basis for appropriate action by the appellate court. *Bresnahan v. Bass*, 562 S.W.2d 385 (Mo. App.1978). Appellate jurisdiction was determined by the filing of the notice of appeal and is in this court. See also *City of Webster Groves v. Institutional & Pub. Emp. U.*, 515 S.W.2d 444 (Mo.1974); *State v. Perry*, 499 S.W.2d 473 (Mo.1973); *State v. Bascue*, 485 S.W.2d 35 (Mo.1972); *Whealen v. St. Louis Soft Ball Ass'n*, 356 Mo. 622, 202 S.W.2d 891 (1947); *Brock v. Steward*, 519 S.W.2d 365 (Mo.App.1975).

The appellant was born April 29, 1948, in Jonesboro, Arkansas. It is not clear from the record where he had spent his life, but it does appear that he was familiar with and had been employed in Southeast Missouri, and in particular the Campbell, Missouri, area. He had picked fruit in that area and in Florida. He completed the 10th grade and while in the Navy completed what he termed the equivalent of one and one-half years in college. He had been married, but at an undisclosed time was divorced from his wife who had custody of their four children. In the early part of 1976 he started living with Connie Flowers who he said was his common-law wife. Her background too is vague, but she had for some period of time been familiar with and lived in the Campbell, Missouri, area. Much

of the time they lived out of their car. On October 14, 1977, a son was born to this couple.

One James Bundy lived near Campbell, Missouri. Only by inference it seems he was engaged in business there, apparently including a tavern. Late on February 19 or in the early morning hours of February 20, 1977, Bundy was attacked in the kitchen of his home. A violent struggle ensued and it may clearly be inferred that he was hit on the head with a 16 ounce pop bottle which shattered. A trail of blood led from the kitchen through the yard to the gravel road in front of the house. At approximately 9:15 a. m. on February 20, 1977, his body was discovered beside a country road about three miles south of Campbell. He had bare feet which appeared to be stained from the burnt stubble in a field in the area. His hands were in handcuffs behind his back. He had been shot three times in the head. One .32 caliber bullet was recovered from his head and two dug from the ground underneath his head. Again by inference, it is established that Mrs. Bundy was at home at the time of the attack and described the assailant as "big as an ox". An intensive investigation followed, but until the appellant's letter to Prosecuting Attorney Baker, about which more will be said later, the authorities had no real lead to the person or persons involved in the Bundy death.

On April 23, 1977, one Ira Smith who also lived in the area was lured into his shop. There he was killed by a blow to the head and robbed. Two days later the defendant was arrested in Texas and returned to Missouri where he was tried and convicted of the Smith murder. He was sentenced to life imprisonment. His conviction was affirmed. *State v. Garrett*, 566 S.W.2d 516 (Mo.App.1978). On November 3, 1977, the appellant was taken to the penitentiary under his sentence for the Smith slaying.

Connie Flowers then established living quarters near the penal institution in which the appellant was confined. She visited the appellant regularly, bringing the little boy with her. According to the appellant on

her January 2, 1978, visit she announced she was leaving, but didn't say where she was going or who she was going with. Upon hearing this the appellant says he was so worried about her and so worried about the little boy that "his nerves went". He reported to the hospital and was started on tranquilizers. He sought help from the counselor.

From some motive, which will be discussed later, he then tried to involve Connie Flowers in a criminal prosecution. He first reported her activities in marijuana. These reports produced no results. Then on January 9, 1978, he wrote the Prosecuting Attorney of New Madrid County, implicating Connie in stealing a car and the murder of Ira Smith and asking "that justice be done and the guilty be prosecuted." He then wrote a series of letters to the Public Defender expressing his concern that Connie was not caring for the little boy, implicating her in the Smith murder and asking help in seeing that she was prosecuted. He also related that his religion compelled him "to tell the truth and let God take care of us all." These letters were unsuccessful. In the meantime the appellant had apparently learned Connie's address in California and instigated an investigation of the status of his child. By letter dated April 20, 1978, the Division of Family Services of Tulare County, California, advised the appellant they found no evidence of child abuse or neglect.

Nevertheless, the appellant persisted in his efforts to instigate a prosecution against Connie. On April 29, 1978, he wrote a letter to the Prosecuting Attorney of Dunklin County. This letter opened: "You people were right when you thought the Fraziers killed a man by the name of Bundy." It should be noted that Connie's maiden name was Frazier. He then related how he and Connie came back from Florida in the first part of February. Connie's brother reported that a man in the community would pay $1000 to have Bundy killed. The three talked to this man who paid them $1000. He related he then passed out because of "drugs and dope". He remembered waking up to the sound of a gun and Connie curs-

ing him because she and her brother had to kill Bundy. They threw the gun in a flood ditch and he and Connie went back to Florida. He went on to relate that when they came back to Missouri she told him to prove he was a man he should rob and kill Ira Smith "whitch [sic] we did". He gave Connie's California address and pleaded that Connie be stopped before she kills someone else or hurts the son. He concluded, "I have to clear my conscience before it runs me crazy, I can't stand these nightmares anymore."

Highway Patrolman Plunkett and Deputy Sheriff Dearing talked informally with the appellant in Jefferson City on the morning of May 4th. That afternoon he was given a polygraph test. There was no evidence concerning the results of that test. On May 5th, the appellant made a video tape confession in which he related some additional details of the murder. On May 6, the appellant was returned to Kennett. On the return the group stopped for toilet purposes at the place where the body was found without mention of that fact to the appellant. The stop was made to see if the scene would jog the appellant's memory. Commencing at 6:40 p. m. that night he gave an extensive interview concerning the crime in which he supplied additional details. This interview was recorded. Thereafter, Connie Flowers and Donnie Frazier were separately charged with the Bundy murder. A joint preliminary hearing for Connie Flowers and Donnie Frazier was held on June 2, 1978. At this preliminary the appellant's court appointed attorney was present. The appellant chose to testify and again, in a more succinct manner, related the events of the murder. As will be further noted, the details of these events were expanded in the video tape and still further in the recorded statement. In each he said his memory was limited because of his intoxication from drugs and alcohol. In each he attempted to place himself in a passive role, and in the latter said he pleaded with Connie not to shoot Bundy. It was in the recorded statement that he remembered entering the Bundy dwelling and

helping to carry the unconscious man to the car.

On September .12, 1978, the appellant filed a motion to suppress the letter and subsequent statements and preliminary hearing testimony alleging among other things that his admissions or confessions were false, having been contrived while he was under duress because Connie had left and was not taking proper care of their son. He also asserted that he was not advised of his rights before writing the letter and by reason of his mental condition all admissions or confessions were involuntary. At the hearing upon the motion the state offered evidence which, if believed, established that before the video tape and recorded statement he was carefully advised of his rights and waived those rights; that at the preliminary hearing he was represented by counsel and was advised by the court of his right not to testify; that in each instance he was in possession of his faculties and acted voluntarily. The appellant in substance testified: that his statements were false; that when Connie left he became very disturbed because he knew she would not take care of the little boy; he tried to cause her to be prosecuted so the child would be placed in a foster home; and for that purpose when his earlier efforts failed he wrote the letter concerning the Bundy murder. He testified concerning his emotional condition and course of medication. He was upset and on tranquilizers when he wrote the Bundy letter and made the statements. He supported his position with the testimony of the prison counselor who related: the appellant was very upset on January 3, 1978, so much so that he was vibrating; the appellant's stated concern for the little boy and his earlier efforts to have her arrested; and that he was in a nervous condition and that appellant was an epileptic and took medication for that condition. He last saw the appellant about April 10 and the appellant was better than when he was first seen. He did not know what medication appellant was then taking or his state of mind when the Bundy letter was written. Appellant's cell mate confirmed appellant's declared concern for the little boy, although appellant didn't mention his name, and that the appellant was nervous and upset. With appropriate findings, the motion to suppress was overruled.

The trial was held the following day. The state introduced evidence of the scene at the Bundy house; established there were three bullet wounds to Bundy's head; presented the background for the letter, video tape, recorded statement and preliminary hearing testimony. The video tape was played and the letter and transcripts of the statements and testimony were introduced along with pictures of the Bundy home and the body and the scene where it was found. The officers active in the investigation conceded they had no real lead until the Bundy letter. The highway patrolman observed that the appellant's statements grew as he talked, but denied that anyone suggested any answers to him. The appellant testified much as he did upon the hearing upon the motion, as did the counselor. The appellant also presented a witness who contracted for fruit picking in Florida and Missouri. He was contacted in Missouri and returned to Florida to obtain records concerning his employment of Jim Garrett. These records consisted of a field book which he or his foreman made and a payroll sheet which his daughter-in-law made from the field book. The field book purported to show Jim Garrett picked on February 19, 20, 21, 22 and 23, 1977. The payroll sheet purported to show that on February 24, 1977, a check was issued to Jim Garrett for $13.21 representing the fruit he picked less a cash advance and less social security. Such a check was introduced. The witness first met Garrett the day he was hired and that night loaned him a tractor to change the motor in a van. He said Garrett worked for him four weeks and he hadn't seen him since. It should be noted these records show significant irregularities. In his recorded statement the appellant stated he told Connie, "I got people in Florida that would say I was there the whole cotton picking month if need be". The jury did not accept the appellant's recantation, explanation or alibi and returned a verdict of

guilty. Therefore, the evidence on the issue of guilt must be viewed most favorably to the state. *State v. Ridinger*, 589 S.W.2d 110 (Mo.App.1979).

■ The appellant has been exceptionally well represented in the trial court and in this court by his appointed counsel. On appeal he raises nine points for review. His initial point, with three subpoints, concerns the confessions and admissions of the appellant. He first contends the trial court erred in overruling the motion to suppress. He argues that because he was not advised of his rights as delineated by *Miranda*[1] and did not waive those rights before writing the Bundy letter to the Prosecuting Attorney, the letter is inadmissible. He then reasons that the video tape statement, recorded statement and preliminary hearing testimony are the "fruits of that poisonous tree" and are likewise inadmissible. The *Miranda* requirements are applicable to the interrogation of an individual held in custody for an offense other than the offense concerning which he is being interrogated. *Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). However, beginning with the decision in which those requirements were enunciated, it has been clear that the *Miranda* requirements are applicable only to statements resulting from interrogation. "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda v. State of Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966). The Bundy letter was not the result of interrogation but a statement "blurted out" by the appellant and was not inadmissible because the *Miranda* warning had not been given. *State v. Burnett*, 429 S.W.2d 239 (Mo.1968); *Boyer v. State*, 527 S.W.2d 432 (Mo.App.1975); *State v. Purvis*, 525 S.W.2d 590 (Mo.App.1975).

■ The appellant also argues that at the time of the Bundy letter he was in such a mental condition as a result of drugs and concern over his child and under such duress because of that concern his statement was not voluntary. It is true the defendant had been on medication when he wrote the letter. But, that fact alone does not make the letter inadmissible. *State v. Crowley*, 571 S.W.2d 460 (Mo.App.1978). The contrary was established by the appellant's testimony: "I knew exactly what I was doing." Upon recantation of his confession the appellant insists his motive, even compulsion, to write the letter was concern for his child. His insistence does not necessarily establish that to be true. He wrote the letter after the California agency advised him there was no abuse of the child. He repeated his statement incriminating himself and Connie at the preliminary hearing after the child had been returned to Missouri and placed in a foster home. His motive may well have been anger toward Connie when she left. In one of his letters to the Public Defender he insists that the fact Connie testified for the prosecution in the *Smith* case does not change her guilt one bit. Other factors could be advanced to discount his declared motivation. Whatever is determined to have been his self-motivation is properly considered as going to the weight of his incriminatory statements vis a vis his recantation but is not such duress or influence as to render those statements inadmissible. *State v. Granberry*, 484 S.W.2d 295 (Mo.banc 1972); *State v. Hutson*, 537 S.W.2d 809 (Mo.App.1976).

The appellant then argues the statements should not have been admitted because they were contrived. To emphasize his assertion of contrivance he points out inconsistencies between the statements and otherwise established facts such as: referring to the date as February 7 or 8 when it was February 19 or 20; referring to the gun as a .38 when it was a .32; and the authorities inability to find the gun where he said it had been thrown. In considering these inconsistencies the trier of fact could have also considered he said, "I think it was on

---

1. *Miranda v. State of Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966).

the 7th or 8th" when he came from Florida; he wasn't certain of the caliber but it looked like a .38; and the fact the gun could have been covered up or washed away. It could have also considered the consistency of the four statements as well as the fact the statements were overall consistent with the otherwise established facts. To counter the latter, the appellant insists the statements became more detailed as he talked with the authorities who supplied the information. Again, the trier of fact could have considered factors such as: that the video tape contained consistent facts which could have been known only to one involved in the crime and the interviewing officers testified no answers or facts were suggested to the appellant; that in the law library interview he described the deceased's shirt as checked or "flowerdy" before the type of shirt was mentioned and before he was shown a picture of the body clad in a blue-check shirt; and that there is no suggestion the officers knew, as Garrett related in his recorded statement, that in Florida he took the motor from his car and junked it, which occurrence was confirmed by the citrus picker. In all events, these considerations go to the weight to be given to the confessions and do not cause them to be inadmissible.

█ The appellant's next point is that the trial court did not make the required findings of voluntariness upon overruling his motion to suppress. He argues the trial court was required to specifically find in respect to each incriminating statement (1) the *Miranda* warnings were given; (2) the appellant voluntarily, knowingly and intelligently waived his right to counsel at the interrogation; and (3) the statements were voluntarily made. He emphasizes the absence of a finding concerning waiver of counsel. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205 (1964) did establish that the appellant was entitled a determination of the voluntariness of his incriminating statements separate and apart from the principal trial and a reliable resolution of the evidentiary conflicts. *Sims v. Georgia*, 385 U.S. 538, 544, 87 S.Ct. 639, 643, 17 L.Ed.2d 593, 598 (1967)

declares "although the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity." These cases have been followed by countless decisions declaring the extent of the required findings and sufficiency of the determination. From these decisions there may be found various declarations of those requirements, such as those in *Evans v. United States*, 375 F.2d 355 (8th Cir. 1967) cert. den. 397 U.S. 1014, 90 S.Ct. 1248, 25 L.Ed.2d 428. *Stidham v. Swenson*, 443 F.2d 1327 (8th Cir. 1971), cited by the appellant has been overruled. Compare *United States v. Gardner*, 516 F.2d 334 (7th Cir. 1975). The overall thrust of these cases is not that in every hearing upon a motion to suppress the court must expressly and explicitly make a determination on each element of the *Miranda* warning. It is that the trial court must make a determination of admissibility, often referred to as voluntariness, including, or based upon, an express or clearly implied finding in respect to the issues that have been raised. *State v. Monteer*, 467 S.W.2d 48 (Mo.banc 1971); *State v. Jackson*, 499 S.W.2d 467 (Mo.1973). Only in respect to the Bundy letter did the appellant specifically assert inadmissibility because of the absence of the *Miranda* warning and an informed waiver of counsel. The balance of his motion was based upon his mental condition and a general charge that he was not informed of his constitutional rights. At the conclusion of the suppression hearing the trial court expressly found that in respect to all the statements they were voluntary, made after he had been given the *Miranda* warning, made without coercion, threats or promises; and were knowingly and understandingly made. In regard to the Bundy letter, as above stated, no *Miranda* warning was required. At the time of the preliminary the appellant had been given the *Miranda* warning at least four times and he had a competent lawyer. In these instances no question of waiver was involved. If the question of waiver of counsel in regard to the video tape and recorded statements was impliedly

raised, it was implicitly determined by the finding of the trial court that those statements in which the appellant was given the required warning and said he waived counsel were voluntarily and understandingly given. *State v. Monteer*, supra.

The appellant's next point is that the trial court erred in overruling his motion for acquittal because his conviction cannot be sustained upon the basis of his uncorroborated confessions. He cites cases requiring independent proof of the corpus delicti. It is true that a conviction cannot be sustained solely on the basis of an extra judicial confession. To some degree there must be independent proof of the corpus delicti. "The rule in this state has long been that full proof of the corpus delicti, independently of the confession, is not required. If there is evidence of corroborating circumstances which tend to prove the corpus delicti and correspond with circumstances related in the confession, both the circumstances and the confession may be considered in determining whether the corpus delicti is sufficiently proved in a given case." *State v. Skibiski*, 245 Mo. 459, 463, 150 S.W. 1038, 1039 (1912). Also see *State v. Hawkins*, 584 S.W.2d 640 (Mo.App.1979); *State v. Page*, 580 S.W.2d 315 (Mo.App. 1979); *State v. Stephens*, 556 S.W.2d 722 (Mo.App.1977). However, when there is proof of the corpus delicti other than by the confession there is no requirement of independent evidence to link a defendant to the crime. "But, once evidence other than the defendant's confession shows that the specific crime charged was committed by someone, then the defendant's confession is admissible and, of course, if believed completes the case." *State v. Hawkins*, 165 S.W.2d 644, 646 (Mo.1942).[2] Also see *State v. Hardy*, 365 Mo. 107, 276 S.W.2d 90 (banc 1955); *State v. Worley*, 375 S.W.2d 44 (Mo. 1964). In this case the state did by independent evidence establish the corpus delicti; i. e. the death of Bundy and that this was the result of the criminal agency of

another person. *State v. Stephens*, supra. That being so, the appellant's confessions are sufficient to sustain his conviction. *State v. Hawkins*, supra, 165 S.W.2d 644.

The appellant next complains that the admission in evidence of ten pictures of the Bundy home, six of the body, four of the head wounds, the three bullets and handcuffs created undue prejudice against the appellant and inflamed the jury. The trial court has a wide discretion in determining whether or not otherwise admissible evidence, even though possibly inflammatory, should be admitted over such an objection. *State v. Stevens*, 467 S.W.2d 10, 50 A.L.R.3d 96 (Mo.1971) cert. den. 404 U.S. 994, 92 S.Ct. 531, 30 L.Ed.2d 546 (1971). Such a determination involves a balancing of the probative value of the evidence against the possible inflammatory effect of the evidence. *State v. Jackson*, supra, 499 S.W.2d 467. All of the evidence in question was relevant. The probative value of the bullets and handcuffs was not great, but neither was the possibility that such evidence would be inflammatory. The pictures of the home were of greater probative value in showing the events of the crime as they related to the statements of the appellant. There is a greater possibility the pictures of the body and head wounds might tend to be inflammatory. But, their probative value is greater as they related to the appellant's statements of his memory concerning the circumstances of the shooting. The trial court did not abuse its discretion in admitting this evidence. *State v. Jackson*, supra; *State v. Denson*, 574 S.W.2d 445 (Mo.App.1978).

The appellant's next point concerns the voir dire examination of the jury panel. Appellant's counsel opened his examination with a series of remarks and questions, in the nature of remarks, related to the presumption of innocence. Compare *State v. Cheesebrew*, 575 S.W.2d 218 (Mo. App.1978). He then asked the jurors who presumed the appellant to be innocent to

---

2. This should not be construed as requiring the corpus delicti to be proved before the introduction of a confession. See *State v. Arndt*, 143 S.W.2d 286 (Mo.1940); *State v. Thompson*, 333 Mo. 1069, 64 S.W.2d 277 (1934).

raise their hands. Only ten did and on that basis the appellant challenged the entire panel. The trial court then instructed the jury the law presumes every defendant innocent. The court then asked those willing to follow that presumption to raise their hands and all jurors did so. The challenge was overruled. The qualifications of a juror are not conclusively determined by his or her initial response to a question. That determination is to be made upon the basis of the entire examination. *State v. Treadway*, 558 S.W.2d 646 (Mo.banc 1977) cert. den. 439 U.S. 838, 99 S.Ct. 124, 58 L.Ed.2d 135; *State v. Shepherd*, 553 S.W.2d 498 (Mo.App.1977). This standard is frequently applied in regard to jurors' responses to questions concerning their pre-conceived or self-formed conceptions of the legal principles to be followed in casting their vote as a juror.[3] For example, the weight to be given the testimony of an officer, *State v. Pitchford*, 556 S.W.2d 57 (Mo.App.1977); the exercise of the Fifth Amendment, *State v. Shepherd*, supra; and a presumption of innocence, *State v. Hill*, 518 S.W.2d 682 (Mo.App.1975); *State v. Treadway*, supra. If, after further questioning or explanation, the jurors indicate an ability to follow applicable principles of the law, the qualifications of the jurors are to be determined by the trial court. *State v. Ford*, 495 S.W.2d 408 (Mo.banc 1973). Because the trial court observes the reaction and demeanor of the jurors, every doubt is to be resolved in favor of the trial court's ruling and that determination will be declared erroneous only if there has been a clear abuse of discretion. *State v. Treadway*, supra; *State v. Harris*, 425 S.W.2d 148 (Mo.1968). In this case after an explanation of the presumption each juror without reservation signified an ability to abide by the presumption. The action of the trial court in overruling the challenge was not error. *State v. Hill*, supra.

The appellant next asks for a new trial because the trial court injected itself into the case on the side of the state. The incidents he complains about are: when confusion arose concerning whether or not the video tape had been received in evidence suggesting that it be reoffered; when the same question arose concerning the Bundy letter, suggesting that it be identified and offered; by determining that information the appellant was attempting to elicit was hearsay and in other instances cautioning counsel about the use of hearsay, the latter in absence of objection by the state; and inquiring if a member of the jury could see the projection of the video tape and asking the operator to change the position of the machine. "One of the well-recognized powers of the judicial function is the right and duty of the trial judge to propound additional questions to witnesses in order to develop the truth more fully and to clarify the testimony given." *State v. Grant*, 394 S.W.2d 285, 287 (Mo.1965). Of course, the trial court must maintain complete fairness and impartiality. The record reflects the trial court in performing its duty did just that and its actions were not error. *Morris v. State*, 547 S.W.2d 827 (Mo. App.1977); *State v. Snow*, 541 S.W.2d 11 (Mo.App.1976); *State v. Farmer*, 536 S.W.2d 748 (Mo.App.1976).

In the trial of the case late in the afternoon, after informing the jury that by stipulation, if the trial was recessed to the following day, they would be permitted to go home, the trial court inquired how many wanted to continue the trial. There was a unanimous vote to continue the trial. Then, at the conclusion of the evidence, after outlining the subsequent procedures and giving a time estimate, the trial court again inquired how many wanted to remain. Again, there was a unanimous vote to continue. The appellant voiced no objection at the time. The case was submitted to the jury at 11:10 p. m. They returned at 1:47 a. m. with a verdict of guilty of murder in the first degree but failed to fill in the blank assessing the punishment. Upon in-

3. Concerning proper questions and correct procedure for such inquiries see *State v. Brown*, 547 S.W.2d 797 (Mo.banc 1977).

structions from the court to reexamine the verdict, the jury retired again and returned at 1:50 a. m. with the blank completed assessing punishment at life imprisonment. The appellant cites this brief interval in support of his argument that by permitting the trial to continue so long the trial court abused its discretion and deprived the appellant of a fair trial. The lateness of the hour at which a jury deliberates may have unwanted effects through fatigue or coercion. However, the prospect of returning for another day could have an equally coercive effect. The time at which a jury may properly deliberate is within the sound discretion of the trial court. *State v. Covington*, 432 S.W.2d 267 (Mo.App.1968); *United States v. Stone*, 452 F.2d 42 (8th Cir. 1971). In this case the trial court could observe whether or not the jury appeared fatigued. None was expressed. No coercion was present as on two occasions the jury unanimously expressed a desire to continue. At the time, no suggestion to the contrary was made by the appellant. The short interval in completing the verdict does not demonstrate the absence of deliberation. Failure to complete the verdict was no doubt the result of inadvertence as under Instruction No. 6 the jury had been informed if they reached a verdict of guilty of murder in the first degree "you will fix his punishment at life imprisonment." Compare *United States ex rel. Latimore v. Sielaff*, 561 F.2d 691 (7th Cir. 1977), cert. den. 434 U.S. 1076, 98 S.Ct. 1266, 55 L.Ed.2d 782, in which the jury at 10:25 p. m. requested to be bedded down, but deliberations continued and verdicts returned at 3:22 a. m. were approved; and *United States v. Parks*, 411 F.2d 1171 (1st Cir. 1969) in which deliberations until 3:07 a. m. were criticized. Under the circumstances the trial court did not err in permitting the jury to deliberate until 11:50 a. m. *People v. Crandall*, 45 N.Y.2d 851, 410 N.Y.S.2d 66, 382 N.E.2d 766 (1978) in which 3:27 a. m. was approved; *United States v. Stone*, 452 F.2d 42 (8th Cir. 1971) in which 1:15 a. m. was approved.

The appellant also challenges the sufficiency of the information, having first attacked the same by a motion for acquittal at the close of all the evidence. In substance the information charged that the appellant "willfully, unlawfully and feloniously premeditatedly, deliberately, and of malice aforethought" made an assault on Bundy with a pistol and "feloniously, willfully, premeditatedly, deliberately and of malice aforethought" shot and killed him. The appellant complains that the first clause omitted the word "knowingly" and the second omitted the words "unlawfully" and "knowingly". The omission of "unlawfully" in the second clause does not cause the information to be subject to the appellant's attack. Such allegation in the first clause is sufficient. *Lawson v. State*, 542 S.W.2d 796 (Mo.App.1976). Furthermore, the charge of shooting and killing Bundy in the language used clearly implies that act was unlawful. *State v. Williams*, 296 S.W. 155 (Mo.1927). Nor did the omission of "knowingly" make the information subject to such attack. "Rule 24.01, V.A.M.R., provides that an information 'shall be a plain, concise and definite written statement of the essential facts constituting the offense charged.' This court has 'long ago departed from the extremely technical requirements of common law indictments and informations.' . . . An information is not to be held insufficient for failure to follow the exact words of a statute *if words of similar import are employed*." *State v. Parker*, 476 S.W.2d 513, 516 (Mo.1972). Emphasis added. Also see *Hodges v. State*, 462 S.W.2d 786 (Mo.1971), *State v. Simone*, 416 S.W.2d 96 (Mo.1967), *State v. Moore*, 501 S.W.2d 197 (Mo.App.1973). The term "feloniously" has been held to imply a change of "intent" to secretly confine. *State v. Weir*, 506 S.W.2d 437 (Mo.1974). "The word 'intentionally' necessarily includes and is broader than the term 'premeditatedly,' and 'wilfully' and 'intentionally' are interchangeable." *State v. Abram*, 537 S.W.2d 408, 411 (Mo. banc 1976).[4] "The meaning of 'wilfully' is well known, and 'unlawfully and felonious-

---

4. This case and others cited deal with instructions where the import of the language used is of equal, if not more, importance than in informations.

ly' likewise import intentional acts." *State v. Stavricos*, 506 S.W.2d 51, 56 (Mo.App. 1974). "The word 'wilfully' has often been defined in this State and elsewhere as meaning 'intentionally' or 'knowingly' in defining a criminal offense." *State v. Foster*, 355 Mo. 577, 197 S.W.2d 313, 321 (1946). That a defendant "knowingly" has possession of a proscribed drug is a substantive element of the crime and such an element is implied in the charge "unlawfully and feloniously". *State v. Williams*, 546 S.W.2d 533 (Mo.App.1977). Further, while omitting the term "knowingly", the information does allege the appellant acted "of malice aforethought". Malice is defined as: "Intention or desire to harm another." *Webster's Third New International Dictionary.* Clearly the meaning of the term "knowingly" has been charged by words of similar import. If there was any doubt, which there could not have been, that doubt was removed by the information's reference to the statute, § 559.005, under which the appellant was charged. *State v. Barkwell*, 590 S.W.2d 93 (Mo.App.1979). An information "must adequately notify a defendant of the charge against him and constitute a bar to further prosecution for the same offense." *Hodges v. State*, 462 S.W.2d 786, 789 (Mo.1971). Paraphrasing the *Barkwell* case: "The omission of the word 'knowingly' does not render it insufficient to meet those requirements."

Appellant's next point is that the trial court erred in overruling his motion for a mental examination pursuant to § 552.020. At the conclusion of the trial the trial court fixed November 8, 1978, to hear appellant's anticipated motion for new trial, and, if appropriate, sentencing. The motion for a new trial was filed October 24, 1978. On November 8, 1978, the appellant presented the motion in question. The hearing upon all motions was continued to November 22, 1978, and then to December 13, 1978, when both motions were overruled and the appellant was sentenced.

 The motion in question in substance alleged: The motion was filed by counsel at the request of appellant; that after the trial appellant had become more nervous and had a nervous breakdown involving shaking and a locking into position of his limbs and body; that since the trial the appellant does not know whether or not he committed the acts and at times, he is sure he could not have done so but at other times he has mental images of details pertaining to the crime. His attorney added that he believed the appellant could not assist his attorney in presenting arguments relative to the sentencing procedures. § 552.020, Subd. 1 provides: "No person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures." Such a motion for an order for a mental examination may be made at any time before sentencing. *State v. Rand*, 496 S.W.2d 30 (Mo. App.1973). But, the trial court is not automatically required upon the filing of a motion to order an examination and proceed under § 552.020. It is required to enter such an order only when a bona fide issue of doubt exists as to a defendant's capacity to proceed. *State v. Jennings*, 555 S.W.2d 366 (Mo.App.1977). "[T]he real issue is whether the court had reasonable cause to believe that appellant had a mental disease or defect excluding fitness to proceed, which is the requirement under the statute." *State v. Dixon*, 546 S.W.2d 774, 777 (Mo.App.1977). Also see *Bryant v. State*, 563 S.W.2d 37 (Mo.banc 1978).

 The motion in no way alleged the appellant did not understand the proceedings against him. The only assertion related to his capacity to assist in his own defense. There is no suggestion how the appellant could possibly assist in regard to sentencing when the jury returned a verdict of guilty and the sentence was mandated by statute. Compare *State v. Harris*, 477 S.W.2d 42 (Mo.1972). It is not every mental aberration that requires an order for an examination. *Bryant v. State*, supra; *McCarthy v. State*, 502 S.W.2d 397 (Mo.App. 1973). The rule that "[a]mnesia is no bar to

prosecution of an otherwise competent defendant," *State v. Gardner*, 534 S.W.2d 284, 289 (Mo.App.1976), is applicable to this case. Also see *United States v. Stevens*, 461 F.2d 317 (7th Cir. 1972), cert. den. 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 218.

There are other factors which support the action of the trial court. "What is determinative of the issue of appellant's competency to proceed with trial is the trial court's observation of him and its appraisal of his mental state." *State v. Fulsom*, 557 S.W.2d 671, 673 (Mo.App.1977). The trial court observed the appellant on the video tape, upon the motion to suppress, on November 8 and December 13, 1978. Until the motion in question, there was no suggestion of incompetency to proceed, even in the motion for new trial. Compare *State v. Fulsom*, supra, and *State v. Rand*, supra. Concerning the duty of counsel, see *Witt v. State*, 582 S.W.2d 325 (Mo.App.1979). The court could have concluded the motion was the result of appellant's personal strategy. See *King v. State*, 581 S.W.2d 842 (Mo.App. 1979); *State v. Fulsom*, supra. The circumstances did not require the trial court to order an examination. *State v. Harris*, supra.

The appellant next asserts error because of the use of the video tape as evidence of his confession. He premises this argument upon a charge it shows the appellant in less than a favorable light, encouraged by the officers, smoking and laughing while relating his confession. The tape demonstrates the charge is not valid. The statement was taken in a very fair and professional manner. Further, before the tape was made he was fully advised of his rights as required by *Miranda* and specifically told it would be used against him. He cannot claim error because that tape accurately portrayed the manner in which he chose to present himself. The use of video tape has been consistently approved. *State v. Lindsey*, 507 S.W.2d 1 (Mo.banc 1974); *State v. Lusk*, 452 S.W.2d 219 (Mo.1970); *State v. Hamell*, 561 S.W.2d 357 (Mo.App. 1977).

The appellant's last point is that the trial court erred in adding to his life sentence the condition that it was without the possibility of parole for fifty. years. This point is based upon the proposition that since neither the verdict directing instruction nor the verdict returned by the jury imposed such a condition he was denied his constitutional right to a jury trial on that issue. A defendant has no constitutional right to have his sentence fixed by a jury. *State v. Daugherty*, 484 S.W.2d 236 (Mo.1972); *Turnbough v. Wyrick*, 551 F.2d 202 (8th Cir. 1977), cert. denied, 431 U.S. 941, 97 S.Ct. 2658, 53 L.Ed.2d 260. The condition concerning parole was directed by statute, §§ 559.009 and 559.011. As more fully developed in *State v. Hanson*, 587 S.W.2d 895 (Mo.App.1979) this action of the trial court was proper. Having considered all of the appellant's points and finding no error, the judgment is affirmed.

BILLINGS, P. J., and GREENE and PREWITT, JJ., concur.