**STATE of Missouri, Respondent,**

v.

**Donald NASH, Appellant.**

**No. WD 31607.**

Missouri Court of Appeals,
Western District.

July 21, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 25, 1981.

Application to Transfer Denied
Oct. 13, 1981.

---

James F. Speck, Bellman, Speck & Handley, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Catheryn B. Starke, Asst. Atty. Gen., Jefferson City, for respondent.

Before PRITCHARD, P. J., and TURNAGE and CLARK, JJ.

TURNAGE, Judge.

Donald Nash was convicted by a jury of burglary in the first degree, § 569.160, RSMo 1978, and rape, § 566.030, RSMo 1978. Punishment was assessed at 15 years on each count and the court ordered the sentences to run concurrently. On this appeal Nash raises points concerning the sufficiency of the evidence; a comment concerning a mugshot; an improper question posed by the prosecutor and the sufficiency of the indictment. Affirmed.

The victim of the rape, K.T., and Nash lived in the same apartment complex, though in different buildings. The apartment of each was on the top or third floor of their respective buildings and from Nash's apartment it was possible to view the dining room of K.T.'s apartment. The building in which Nash lived was about 15 feet from the building in which K.T. lived.

Each apartment had a balcony which opened from the apartment through glass sliding doors. The balcony was surrounded by metal bannisters. The distance from the top of the bannister of one balcony to the floor of the balcony above was about 5 to 6 feet. K.T. testified that she had seen people climb from one balcony to another.

On ground level below the balcony opening from K.T.'s apartment was a swimming pool and the jury could have found that by standing on the wall surrounding the swimming pool one could reach the balcony of the first floor apartment, and from there could ascend to the next balcony and then to the balcony adjoining K.T.'s apartment.

K.T. returned to her apartment from work about 12:30 or 1:00 A.M. on February 8, 1979. She showered and then lay on the bed to watch television but fell asleep. About three or three and one-half hours later she heard or sensed someone in the room and saw a black male in his 20's, about 5'8" or 5'9" in height, with a medium build, standing in the bedroom door. The man jumped on her and threatened to kill her and pressed a metal object to her stomach which he said was a gun. He covered her eyes with her arms and later covered them with a towel. The man then raped K.T. and thereafter rummaged through her purse and dresser drawers. It later developed that her clock radio, bank and $10 were missing. When the man left he threw all of the bed covers over K.T.'s face and told her to remain there. After a while K.T. discovered the man was gone and called the police.

When the first police officer arrived he found the back door open. K.T. was quite distraught, so the officer took her to St. Luke's Hospital. Other police officers arrived and examined the apartment for clues.

K.T. stated she could not identify the man except by the general physical description because she never had an opportunity to see his face.

When a police officer returned K.T. to her apartment from the hospital, K.T. no-

ticed that some leaves from a flower near the sliding doors from the balcony were on the floor. The doors were covered by a closed drape. When the drape was opened, it was discovered one of the sliding doors was open slightly. Evidence technicians from the police department were called back to the scene and succeeded in lifting a latent fingerprint from the edge of the sliding door. The print was made with the palm outside the door with the fingers pointed into the apartment. A fingerprint technician testified the print was dark and clear and fresh. Given the weather condition at the time, the expert said the prints would deteriorate rapidly and in a matter of days. The print was lifted about three to four hours after K.T. had called the police. The fingerprints on the sliding door were identified as those of Nash.

Nash left for California on the evening of the 8th to look for work, according to the testimony of his girlfriend, with whom he lived at the apartment house, and returned to Kansas City in June, 1979. When arrested after his return Nash at first gave a false name then said "I am Nash. I am tired of this, let's go to jail."

■ Nash first challenges the sufficiency of the evidence to support his conviction. In reviewing the evidence to determine its sufficiency, "this court accepts as true all evidence, circumstantial or direct in nature, favorable to the verdict, together with all favorable inferences that can reasonably be drawn therefrom, and rejects all evidence and inferences to the contrary." *State v. Mussman*, 526 S.W.2d 62, 63[1] (Mo.App. 1975).

■ Nash principally argues the fact there was no evidence that the person committing the crime entered through the sliding glass door and further there was no evidence that the fingerprint of Nash was placed on the door at the time the crime was committed.

K.T. testified Nash had never been in her apartment for any purpose nor did he ever have permission to be there. There were three entrances to the apartment: the front door, which K.T. locked when she came home; the back door and the sliding glass doors. After the crime the back door was open and the sliding glass doors were partially open.

K.T. testified that she kept a broom handle in the track of the sliding doors to prevent them from being opened, but the handle was out of the track when the door was discovered open and K.T. did not think she had put the handle in the track the last time she had closed the door.

There can be no doubt that the fingerprints of Nash on the glass door were in a place generally inaccessible to Nash. The evidence was that the fingerprints were fresh and would deteriorate rapidly. Further, Nash's girlfriend with whom he lived testified that he was in bed with her all during the time the crime would have been committed and so was not at K.T.'s apartment. With the fresh fingerprints of Nash on the door indicating the door had been opened by a hand placed on the outside and given the fact the door was in a place generally inaccessible to Nash, the jury could reasonably infer that Nash's fingerprints could not have gotten on the sliding door without the intervention of criminally culpable conduct on his part. *Mussman, supra*, at p. 64.

■ The jury could have inferred that the fresh fingerprints of Nash on the door indicated Nash entered the apartment through the glass doors and since the rear door could be readily opened from the inside, the jury could infer that Nash made his exit through the rear door rather than climbing down from the balcony. The fingerprint evidence, together with the general physical description given by K.T., which matched the physical description of Nash, was sufficient to meet the requirements of the circumstantial evidence rule and to support a finding of guilt. In addition, the jury could infer guilty knowledge on the part of Nash from the fact that he gave a false name when arrested. *State v. Jones*, 575 S.W.2d 899, 900–1[1] (Mo.App.1978).

■ The evidence in this case fully meets the requirement of *State v. Clemmons*, 579 S.W.2d 682 (Mo.App.1979) that the fingerprints could have been impressed only at the time the crime was committed. The evidence that the fingerprints were fresh, would deteriorate rapidly, that they indicated Nash was on the outside of the door when he gripped it, together with the evidence that Nash fit the general description of the intruder, would allow the jury to properly infer that the fingerprints were impressed at the time the crime was committed.

■ Nash further contends that there are a number of possibilities as to how his fingerprints could have gotten on the door, but there is no evidence to support any of these theories. The mere existence of other possible hypotheses is not enough to remove the case from the jury nor does circumstantial evidence need to demonstrate an impossibility of innocence. *Mussman, supra.* Taken as a whole, the evidence was sufficient to support the verdict.

■ Nash next contends the court erred in refusing to grant a mistrial when the police officer who arrested him stated that he recognized Nash because he looked exactly like the mugshot they had. The rule relating to mugshots is stated in *State v. Harris*, 534 S.W.2d 516 (Mo.App.1976). Nash concedes the viability of *Harris* and that he did not show in this case that all mugshots are photographs of persons who have committed other crimes or that the average juror believes that persons whose photographs are on file with the police have committed prior crimes. Nash urges this court to simply assume that mugshots are evidence of the commission of prior crimes. In *State v. Hamell*, 561 S.W.2d 357, 361[10] (Mo.App.1977) the court stated: " ' "Mugshots" are in themselves neutral and do not constitute evidence of prior crimes and offenses. *State v. Harris*, 534 S.W.2d 516 (Mo.App.1976).' "

The single reference to mugshots was insufficient to constitute evidence that Nash had been convicted of other crimes.

■ Nash next contends prejudicial error occurred when the prosecuting attorney propounded the following questions to Rosalyn White, Nash's girlfriend:

"Q. Do you think you know Donald pretty well?

"A. Yes, I do . . . .

"Q. So you think you could state pretty surely what he would and wouldn't do?

"A. Yes.

"Q. So, would it be your testimony today that when you told Rebecca Rishel back on the 13th of February, 1979 that you thought Donald would have committed a burglary but you didn't think he would commit a rape _ _ _

"A. I didn't say that exactly that he would _ _ _"

Following the partial answer of the witness an objection was made and the court sustained the objection. Counsel then moved for a mistrial, which was denied.

Nash contends he was entitled to be tried with a presumption that his character was good and he had not put his character in issue by offering evidence of his good character, and, for that reason, the State had no right to assail his character by the above question.

It should first be noted that the witness denied that she had exactly said what the prosecutor purported to have quoted her as saying. It should next be noted that the court did sustain the objection and no further relief was asked short of a mistrial.

The question was objectionable as calling for the personal view of the witness as to the character of Nash. *State v. Antwine*, 506 S.W.2d 397, 399[2] (Mo.1974). The court there stated that such question should not be asked, but if it is, an objection thereto should be sustained. As noted in this case, the objection was made and sustained.

■ It was pointed out in *State v. Cuckovich*, 485 S.W.2d 16, 24 (Mo. banc 1972) that it was significant that the only relief requested was a mistrial. The court

stated that counsel should have also requested the statement to have been stricken and the jury ordered to disregard it and in that way the court could have considered corrective action short of a mistrial. In this case the court should have been given opportunity to take corrective action short of a mistrial in view of the fact the court did sustain the objection. Declaring a mistrial is a drastic action and should be granted only with the greatest caution in extraordinary circumstances. The propriety of using such a remedy is lodged in the trial court. *State v. Morgan*, 592 S.W.2d 796, 808 (Mo. banc 1980) [vacated 449 U.S. 809, 101 S.Ct. 56, 66 L.Ed.2d 12; Readopted after reconsideration, 612 S.W.2d 1 (Mo. banc 1981)]. No abuse of discretion in refusing a mistrial is found.

 Nash finally contends the indictment is fatally defective because it omits the work "knowingly" when it charges that Nash "entered unlawfully in an inhabitable structure ... for the purpose of committing stealing therein ...." Nash contends that § 569.160 requires that a person "knowingly" enter a building unlawfully for the purpose of committing a crime. He contends therefore that since the indictment omitted the word "knowingly" that the indictment did not sufficiently charge a crime under § 569.160.

In *State v. Downs*, 593 S.W.2d 535, 540[1, 2] (Mo.1980) the court stated:

"The fundamental test of the sufficiency of an information is whether or not it states the essential elements of the offense charged so that the defendant is adequately informed of the charge against him and the final disposition of the charge will constitute a bar to further prosecution for the same offense."

*Downs* further observed that Rule 24.01 clearly rejected the extremely technical requirements of indictments of the common law. While it would have been preferable for the indictment to use the word "knowingly" the indictment did charge that Nash unlawfully entered the apartment of K.T. for the purpose of committing stealing. One cannot be charged with entering an apartment for the purpose of committing a crime without being informed that he was being charged with having knowingly entered the apartment unlawfully. The language employed clearly implies that the entry was knowingly. *State v. Garrett*, 595 S.W.2d 422, 432[21–23] (Mo.App.1980). The indictment referred to the section which Nash was charged with violating. That was sufficient to remove any doubts, if there were any, that the entry charged was knowingly made. *Garrett*, at 433. The indictment sufficiently stated the essential elements of the offense to adequately inform Nash of the charge against him and the charge would constitute a bar to further prosecution for the same offense.

The judgment is affirmed.

All concur.